COPY

1 │ Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
2 │ Roland Tellis (SBN 186269)
rtellis@baronbudd.com
3 │ Mark Pifko (SBN 228412)
mpifko@baronbudd.com
4 │ Isaac Miller (SBN 266459)
imiller@baronbudd.com
5 │ BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
6 │ Encino, California 91436
Telephone: (818) 839-2333
7 │ Facsimile: (818) 986-9698

8 │ Attorneys for Plaintiff
BARBARA WALDRUP, individually, and
9 │ on behalf of other members of the public
similarly situated

FILED
CLERK, U.S. DISTRICT COURT

NOV 2 7 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

10

11 │ UNITED STATES DISTRICT COURT

12 │ CENTRAL DISTRICT OF CALIFORNIA

CV13-08833 CAS (CWx)

13 │ BARBARA WALDRUP, individually, and
on behalf of other members of the general
14 │ public similarly situated,

Case Number:

15 │ 　　　　　　Plaintiffs,

**CLASS ACTION**

16 │ 　　vs.

**COMPLAINT FOR:**

17 │ COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware corporation,
18 │ COUNTRYWIDE HOME LOANS, a New
York corporation, COUNTRYWIDE
19 │ BANK, N.A., a national association,
BANK OF AMERICA CORPORATION, a
20 │ Delaware corporation, LANDSAFE, INC.,
a Delaware corporation, LANDSAFE
21 │ APPRAISAL, INC., a California
Corporation,

(1) Violations of California's Unfair
　　Competition Law (Cal. Bus. & Prof.
　　Code §§ 17200 *et seq.*);

(2) Violations of the Racketeer
　　Influenced and Corrupt
　　Organizations Act (18 U.S.C. §
　　1962(c));

22

23 │ 　　　　　　Defendants.

(3) Violations of the Racketeer
　　Influenced and Corrupt
　　Organizations Act (18 U.S.C. §
　　1962(d));

24

25

(4) Fraud; and

26

(5) Unjust Enrichment

27

**Jury Trial Demanded**

28

CLASS ACTION COMPLAINT

1       For her complaint against Defendants Countrywide Financial Corporation,

2 Countrywide Home Loans, Inc., Countrywide Bank, N.A. (together, "Countrywide"),

3 Bank of America Corporation ("BofA"), LandSafe, Inc., LandSafe Appraisal, Inc.

4 (together, "LandSafe") (collectively, "Defendants"), Plaintiff Barbara Waldrup

5 ("Plaintiff"), individually, and on behalf of all other members of the public similarly

6 situated, based on information and belief, alleges as follows:

7 **NATURE OF THE ACTION**

8     1.     This case concerns a devious scheme perpetrated by Defendants to create

9 phony so-called "appraisals" of single family homes during the period January 1, 2003 to

10 December 31, 2008, all to the financial detriment of consumers who were forced to pay

11 for such appraisals. The phony appraisals were necessary for Countrywide to rapidly

12 close home loans which were then bundled and sold on the secondary market to Wall

13 Street investors.

14     2.     During the period 2003 to 2008, Countrywide became the largest home

15 mortgage lender in the United States, having originated over $400 billion in loans each

16 year. In addition to its thriving loan origination and service business, Countrywide also

17 became a leader in the securitization of home loans. Along the way, Countrywide reaped

18 hefty profits based on the quantity, not on the quality, of the loans it successfully

19 originated and sold to Wall Street investors.

20     3.     Recognizing that it needed to close as many loans as possible to maintain its

21 hefty profit margins, Countrywide began removing the "toll gates" that slowed or

22 obstructed the loan origination process. One of those "toll gates" was the ever important

23 appraisal.

24     4.     Obtaining an appraisal is a critical element of the home buying or refinancing

25 process because it provides a buyer or homeowner with an accurate and objective opinion

26 of a property's value. Indeed, under federal and state laws, as well as ethics rules of the

27 generally accepted Uniform Standards of Professional Appraisal Practice ("USPAP"),

28 professional appraisers are required to be fully independent and objective in reaching their

CLASS ACTION COMPLAINT

1  opinions of value.

2       5.    Countrywide understood that borrowers and homeowners would rely on

3  legitimate appraisals to determine whether to close a real estate loan transaction.  For

4  example, if the true value of a home was less than the proposed purchase price, a buyer

5  could attempt to renegotiate the sales price with the seller, or decide not to purchase a

6  home altogether, either of which could prevent a potential loan transaction from being

7  completed and, thus, wipe out generous fees Countrywide expected to earn.  Similarly,

8  homeowners considering a refinance transaction might decide not to do so if the true

9  value of the home did not justify the loan amount.  Accordingly, because a legitimate

10  appraisal had the potential to delay or terminate a prospective loan transaction and, thus,

11  limit Countrywide's ability to securitize and sell such loans to Wall Street, Countrywide

12  opted for a different course of action.

13       6.    As part of the lending transaction, Countrywide required that borrowers use

14  LandSafe as its "approved" appraisal vendor.  Of course, LandSafe was Countrywide's

15  captive, wholly-owned subsidiary over which Countrywide exerted complete dominion

16  and control and, through LandSafe, Countrywide controlled and outcome of the so-called

17  appraisal, a fact not disclosed to prospective borrowers and homeowners.

18       7.    Countrywide and LandSafe agreed to knowingly, fraudulently, systematically

19  and uniformly produce phony, inflated appraisals on home loans originated by

20  Countrywide.  To do so, LandSafe engaged in conduct which included:

21      &bull;  refusing to utilize bona fide, independent appraisers;

22      &bull;  paying generous fees to a select list of appraisers who agreed to inflate

23         home values;

24      &bull;  rewarding appraisers who produced inflated appraisals;

25      &bull;  blacklisting and otherwise retaliating against appraisers who refused to

26         participate in the fraud scheme; and

27      &bull;  providing appraisers with phony information to ensure the creation of

28         inflated appraisals.

2

8.     Together, to the detriment of borrowers and homeowners, Countrywide and LandSafe literally produced phony, inflated "appraisals" which were not performed according to the legal standards applicable to appraisals, and which systematically and routinely reflected an inaccurate inflated value of the property so as to ensure the closing of a loan.

9.     Then, adding insult to injury, Countrywide and LandSafe required borrowers to *pay* between $300 and $600 for the phony "appraisals."

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

11.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law and common law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

12.     Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and (d), and under 18. U.S.C. § 1965, because each of the Defendants transacted business in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims in this lawsuit occurred, among other places, in this District.

## PARTIES

13.     Plaintiff Barbara Waldrup is an individual residing in Houston, Texas and is a citizen of the State of Texas.

14.     Defendant Countrywide Financial Corporation ("Countrywide Financial") is a Delaware corporation registered to do business throughout the United States.

Countrywide Financial, through its subsidiaries Countrywide Home Loans and Countrywide Bank, was engaged in mortgage lending. It was at all relevant times the publicly traded parent and holding company of the Countrywide family of companies, which had their principal place of business and national headquarters at 4500 Park Granada, Calabasas, County of Los Angeles, California.

15. Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a New York corporation with its principal place of business and national headquarters at 4500 Park Granada, Calabasas, County of Los Angeles, California. It was at all relevant times a wholly owned and controlled subsidiary of Countrywide Financial and engaged in the business of originating mortgage loans.

16. Countrywide Home Loans operated a division called Full Spectrum Lending, Inc. ("FSL") which also had its headquarters at 4500 Park Granada, Calabasas, County of Los Angeles, California. FSL was devoted to sub-prime lending and, on December 2004, FSL was merged into Countrywide Home Loans and become one of its internal divisions.

17. Defendant Countrywide Bank, N.A. ("Countrywide Bank") is a national banking association headquartered at 1199 North Fairfax Street, Suite 500, Alexandria, Virginia 22314. Countrywide Bank is a wholly-owned subsidiary of Countrywide Financial and funds loans for Countrywide Financial' s mortgage banking division.

18. Defendant LandSafe, Inc. ("LandSafe") is a Delaware corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024. LandSafe provides loan closing products and services such as credit reports and appraisals.

19. Defendant LandSafe Appraisal Services, Inc. ("LandSafe Appraisal") is a California corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024. LandSafe Appraisal is a subsidiary of LandSafe, Inc. with shared management and employees, and purports to offer appraisal services in connection with mortgage loan closings. LandSafe and LandSafe Appraisal are collectedly referred to herein as "LandSafe."

4

20.    Defendant Bank of America Corporation ("BofA") is a Delaware Corporation, a bank holding company, and a financial holding company. Its principal executive offices are located at 100 N. Tyron Street, Charlotte, North Carolina.

21.    On July 1, 2008, Countrywide Financial, and its subsidiaries including Countrywide Home Loans and Countrywide Bank, merged with Defendant BofA and, as a result, BofA became a successor-in-interest to the Countrywide family of businesses, including Countrywide Financial, Countrywide Home Loans and Countrywide Bank, and assumed liability for their conduct alleged herein.

22.    In the months following the merger, BofA executed a plan to integrate Countrywide's businesses into BofA through a series of transactions by which BofA would acquire control over all of Countrywide's operations.

23.    In April 2008, BofA informed the Federal Reserve that it would "run the combined mortgage business" under the "Bank of America brand" and that Calabasas, California, in Los Angeles County, would be the "the national headquarters for the combined mortgage business."

24.    Bank of America integrated the former mortgage-origination business of Countrywide Financial, including Countrywide Bank and Countrywide Home Loans, into its own mortgage business and externally branded it as "Bank of America Home Loans." Countrywide employees became BofA employees, and BofA announced that it "ended up with the largest [mortgage] servicing platform in the country."

25.    An April 27, 2009 BofA press release noted that "[t]he Bank of America Home Loans brand represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans, which Bank of America acquired on July 1, 2008."

26.    In the months following the Countrywide-BofA merger, BofA executives and spokespersons made public statements that Countrywide's liabilities were factored into BofA's purchase, and that BofA intended to "clean[] up" those liabilities.

27.     For example, on March 1, 2008, a BofA spokesperson stated that "We bought [Countrywide] and all of its assets and liabilities . . . We are aware of the claims and potential claims against the company and have factored those into the purchase."

28.     In a 2008 interview with the New York Times, BofA's former CEO confirmed that "We looked at every aspect of the [Countrywide] deal, from their assets to potential lawsuits and we think we have a price that is a good price."

29.     Likewise, BofA's Form 10-K for 2009 acknowledges that "we face increased litigation risk and regulatory scrutiny as a result of the . . . Countrywide acquisitions."

30.     In November 2010, BofA's current CEO addressed potential litigation arising from Countrywide's operations and stated "[t]here's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we will pay for the things that Countrywide did." One month later, he again confirmed to the New York Times that "Our company bought it and we'll stand up, we'll clean it up."

31.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

## FACTUAL BACKGROUND

### A.     Real Estate Appraisal Standards

32.     An appraisal is an integral part of a real estate loan transaction. It provides a borrower or homeowner with the means to obtain an opinion of value from a licensed and qualified specialist.

33.     Appraisals are typically governed by a number of uniform standards, regulations and laws.

34.     For example, in 1989, Congress adopted appraisal standards for all property insured by the Federal Housing Administration ("FHA"). 12 U.S.C. § 1708(f).  Such

6

appraisals are to "be performed in accordance with uniform standards, by individuals who have demonstrated competence and whose professional conduct is subject to effective supervision." *Id.* at § 1708(f)(1). Additionally, appraisals "shall be performed in accordance with generally accepted appraisal standards," and each appraisal is to be a written statement that is "independently an[d] impartially prepared by a licensed or certified appraiser setting forth an opinion of defined value of an adequately described property as of a specific date, supported by presentation and analysis of relevant market information." 12U.S.C. § 1708(f)(1)(A), (B).

35.    The Uniform Standards of Professional Appraisal Practice ("USPAP") require appraisers to conduct their appraisals independently and competently: "An appraiser must perform assignments with impartiality; objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule. USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions." *Id.* In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client. *Id.*

36.    The USPAP standards are incorporated into federal law, 12 C.F.R. § 34.44. Federal law also sets independence and good faith standards for appraisers involved in federally regulated transactions such as a loan issued by a federally insured financial institution. *See* 12 U.S.C. §§ 3331, *et seq.* Such law provides that an in-house or staff appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. And, for appraisers who are independent contractors or "fee" appraisers, the regulation similarly requires that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the

7

1    property transaction."  12C.F.R. § 34.45.

2        37.    Appraisers and appraisals are also regulated by state laws, including

3    California Civil Code Section 1090.5 which provides, in pertinent part, that: "(a) No

4    person with an interest in a real estate transaction involving a valuation shall improperly

5    influence or attempt to improperly influence the development, reporting, result, or review

6    of that valuation, through coercion, extortion, bribery, intimidation, compensation, or

7    instruction."

8        38.    All of the above-regulations and laws are intended to ensure that borrowers

9    and homeowners who obtain and pay for an "appraisal" receive an independent and

10   objective opinion of value by a licensed, qualified appraiser.

11       **B.    Countrywide's Fraudulent Appraisal Scheme**

12       39.    Commencing in 2003, Countrywide produced hundreds of billions of dollars

13   in loans annually and had a residential mortgage servicing portfolio in excess of $1

14   trillion.

15       40.    Countrywide originated mortgages through its retail operations, primarily

16   branded as "Countrywide Home Loans," where Countrywide acted as the loan broker and

17   the lender.  Countrywide also had a large on-line mortgage origination business and,

18   through an entity called Full Spectrum Lending, Inc. ("FSL"), engaged in sub-prime

19   lending.

20       41.    As the real estate market grew exponentially during the early 2000s,

21   Countrywide's lending and loan servicing business grew rapidly.  By 2004, Countrywide

22   had become the largest mortgage lender in the United States and, to fuel its appetite for

23   profit, Countrywide began loosening its underwriting efforts to rapidly close and sell

24   loans to the secondary market.  To that end, Countrywide viewed the appraisal process as

25   a speed bump in the road to closing a loan.

26       42.    From at least 2004 and continuing through at least 2007, Countrywide

27   maintained a database entitled "Field Review List" which contained the names of

28   "independent" appraisers who were blacklisted by Countrywide because they refused to

inflate the value of properties. And, to further address the "problem" of "independent" appraisers impeding Countrywide's ability to rapidly originate and sell loans, Countrywide targeted and developed an affiliation with LandSafe. Through LandSafe, Countrywide could (1) use its market size to pressure appraisers to inflate appraisals to values necessary for Countrywide to close a loan; (2) punish appraisers who refused to "play ball;" and (3) use fraudulent appraisal "reviews" to revise legitimate appraisals to arrive at values needed to close a loan. Indeed, given Countrywide's significant mortgage lending business, LandSafe had a strong financial incentive to play by Countrywide's rules.

43. On May 13, 2009, a whistleblower named Kyle Lagow ("Lagow") filed a sealed complaint against Countrywide, LandSafe, BofA and others for damages and civil penalties under the False Claims Act in the United States District Court for the Eastern District of New York. In May 2012, Lagow's complaint was finally unsealed and Defendants' phony appraisal scheme was exposed.

44. Lagow's unsealed complaint contains detailed allegations concerning his first-hand knowledge of Defendants' corrupt appraisal conduct. According to Lagow's unsealed complaint, from June 2004 until November 2008, Lagow was employed by LandSafe, Inc. in Plano, Texas as one of the company's original supervisory home appraisers. He was promoted to Field Valuation Manager, then Area Manager, and ultimately Assistant Vice President, Area Appraisal Manager.

45. Lagow's unsealed complaint alleged that during his tenure at LandSafe, he had direct exposure to the false statements, records and/or claims made by LandSafe, its affiliate Countrywide Home Loans, and its parent Countrywide Financial. Lagow witnessed first-hand Defendants' corruption of the appraisal process in a variety of ways, including by: (1) knowingly and fraudulently inflating, and causing inflation of property appraisals on, among others, FHA-backed loans; (2) refusing to supply bona fide appraisers with documents and other materials necessary for appraisals; (3) paying above-market fees to those appraisers who inflated values above actual market values; (4)

9

rewarding appraisers who produced appraisals and appraisal reviews at a rate of as many as 400 per month; (5) blacklisting, retaliating against, auditing, and firing appraisers who refused to corrupt their appraisal reports by fraudulently inflating the value of homes in contravention of federal law; (6) requiring appraisers to rely upon information outside the relevant market to justify inflated valuations in appraisals; (7) providing appraisers with false sales information, not reflecting concessions made by sellers at the time of closing, further corrupting the use of comparables to complete accurate appraisals; and (8) retaliating against persons who questioned or criticized the pattern and practice of inflating appraisals to meet an inflated loan amount.

46.     According to Lagow's unsealed complaint, LandSafe utilized two distinct appraisal mechanisms.  First, it would assign appraisal requests for Countrywide wholesale or retail loans to either outside "fee" appraisers or its "staff" appraisers.  These outside "fee" appraisers were pressured to inflate values through the use of targeted values and threats of blacklisting; and the staff appraisers were pressured directly by their employer, LandSafe, to inflate values falsely, as necessary to close a deal.  Second, it would "review" all appraisals for Countrywide loans ostensibly as a quality control measure.  However, in reality, the "review" mechanism was a sham created by Defendants to: (1) create the illusion of a robust underwriting process to verify property values; (2) allow for rewriting and inflating of any appraisal valuations that, if left undisturbed, would prevent the associated loan from closing; and (3) allow Defendants to market this sham "review" mechanism and thereby mislead investors and regulators into believing its assets were more secure and less in need of oversight than competitor products.

47.     According to Lagow's unsealed complaint, when he started at LandSafe in 2004, he was immediately placed in a supervisory position over a team of staff appraisers whose primary purpose was to perform appraisals on loans originated by Countrywide. His responsibility was to hire and train new staff appraisers in multiple states and to directly supervise these appraisers in their completion of appraisals on Countrywide loans.

10

During his tenure at LandSafe, Lagow opened new markets for the company, hiring teams of appraisers to handle Countrywide's loans across Utah, Colorado, Arizona, Louisiana, Texas and Oklahoma.

48.    As a supervising appraiser and ultimately Assistant Vice President and Area Manager, Lagow was involved in many communications between the LandSafe staff appraisers and Countrywide. He was also directly involved in communications between Countrywide loan originators, through LandSafe, to fee appraisers. In addition, Lagow was given a supervisory position over so-called review appraisers.

49.    According to Lagow's unsealed complaint, early in his tenure at LandSafe, he personally observed Countrywide and LandSafe's manipulation of the appraisal process, a manipulation intended to help fill the mortgage origination pipeline. For example, in early 2005, Lagow attended a meeting with LandSafe President Todd Baur and a group of other appraisal managers. Baur told the appraisal managers, including Mr. Lagow that: (1) that they needed to quit thinking of an appraisal as a separate unit; (2) LandSafe appraisers were there to help facilitate a Countrywide loan closing; and (3) they needed to change their thought process, the clear implication being that they needed to stop thinking like appraisers and think instead like lenders trying to close a loan. Lagow and his colleagues came to understand from Baur that the appraisal manager's job at LandSafe was to make sure that appraisals did not derail Countrywide's loans.

50.    By early 2006, Lagow had identified that Countrywide and LandSafe were exerting control over the home valuation process which resulted in routinely inflated mortgages with actual loan-to-value ratios as high as 115% -- far above the 97% permitted by the FHA insurance program -- which in turn was leading to increased foreclosures.

51.    According to Lagow, just prior to his termination in late 2008, he learned of a formal internal audit of LandSafe's appraisal inflation practice conducted by a Senior Vice President at LandSafe. The audit found that the appraisals conducted by LandSafe were pre-textual, and the appraisal reports always communicated an inflated value

11

1  necessary for Countrywide to close a loan.  Despite these audit results, LandSafe

2  continued its practice of inflating appraisals at Countrywide's request.

3      52.    Through their conduct, Defendants intended to use the fraudulent appraisals

4  to induce borrowers and homeowners to complete loan transactions which were profitable

5  to Countrywide, all to the financial detriment of consumers.

6      **C.    Defendants Defraud Plaintiff *Twice***

7      53.    On or about August 2, 2004, Plaintiff obtained a loan with Countrywide,

8  through its FSL sub-prime division, in connection with her purchase of a home in

9  Houston, Texas.  Countrywide required that Plaintiff utilize LandSafe to perform an

10  "appraisal" of the property.  LandSafe claimed to have performed an "appraisal" of the

11  home which Plaintiff was planning on purchasing, and Plaintiff paid LandSafe a fee of

12  $400.00 for the purported "appraisal."

13      54.    On or about June 6, 2008, Plaintiff refinanced the loan through Countrywide

14  Home Loans, Inc.  Again, Countrywide required that Plaintiff utilize LandSafe to perform

15  an "appraisal" of the property.  LandSafe claimed to have performed an "appraisal" of

16  Plaintiff's home, and Plaintiff paid LandSafe a fee of $320.00 for the purported

17  "appraisal."

18      55.    Plaintiff is informed and believes that both appraisals were conducted

19  pursuant to Defendants' scheme of systematically inflating property values for their own

20  financial benefit.

21      **TOLLING OF THE STATUE OF LIMITATIONS**

22      56.    Any applicable statutes of limitations have been tolled by Defendants'

23  knowing and active concealment, and misleading actions, as alleged herein.  Plaintiff and

24  members of the Class, as defined below, were kept ignorant of critical information

25  required for the prosecution of their claims, without any fault or lack of diligence on their

26  part.  Plaintiff and members of the Class could not reasonably have discovered the true

27  nature of the Defendants' fraudulent appraisal scheme.

28

57.     Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their fraudulent appraisal scheme.  Plaintiff and members of the Class reasonably relied upon Defendants' knowing, affirmative, and active concealment.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

58.     The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' fraudulent concealment of material facts.  Plaintiff and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful conduct alleged herein.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action, on behalf of herself, and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

60.     Plaintiff seeks to represent a Class defined as follows:

> All residents of the United States of America who, during the period January 1, 2003 through December 31, 2008, obtained an appraisal from LandSafe in connection with a loan originated by Countrywide.

61.     Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

62.     Plaintiff reserves the right to establish sub-classes as appropriate.

63.     This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

64.     Numerosity:  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in

the Class is ascertainable based upon the records maintained by Defendants. At this time, Plaintiff is informed and believes that the Class includes hundreds of thousands of members. Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

65.   Ascertainability:  Some names and addresses of members of the Class are available from Defendants' records, and others can be ascertained through appropriate notice. Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

66.   Typicality:  Plaintiff's claims are typical of the claims of the other members of the Class which she seeks to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

67.   Adequacy:  Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class, because she has no interests which are adverse to the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

68.   Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)   The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

14

(b)  If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)  Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

69.   Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

70.   The common questions of fact include, but are not limited to, the following:

(a)  Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 *et seq.*;

(b)  Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

(c)  Whether Defendants were members of, or participants in the conspiracy alleged herein;

(d)  Whether Plaintiff and members of the class sustained damages, and if so, the appropriate measure of damages; and

(e)  Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

71.   In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

15

(b)     The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

72.     Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF**
**Violation of Unfair Competition Law**
**(California Business & Professions Code §§ 17200 *et seq.*)**

73.     Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

74.     Plaintiff brings this cause of action on behalf of herself and the members of the Class.

75.     California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." For the reasons described above, Defendants have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq.*

76.     Through the scheme, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead borrowers and defraud any person; (2) directly and indirectly engaged in an unfair and deceptive act towards a person; (3) directly and indirectly obtained property by fraud and misrepresentation; and (4)

16

1  knowingly made published and disseminated false, deceptive and misleading information.

2      77.    On information and belief, the actions and underlying decisions of

3  Defendants, alleged herein emanated from and occurred within the State of California.

4  California law applies to the claims of Plaintiff and all Class members.  Defendants

5  planned and implemented their wrongful scheme in California and many of the wrongful

6  acts emanated from Countrywide's California offices.

7      78.    Defendants' conduct described herein constitutes an unlawful business

8  practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.* in that the conduct

9  violates the Racketeering Influenced and Corrupt Practice Act ("RICO"), the Real Estate

10  Settlement Procedures Act of 1974 ("RESPA"), California Civil Code section 1090.5, and

11  the common law of fraud and unjust enrichment.  Specifically, as alleged herein,

12  Countrywide has:

- Violated 18 U.S.C. § 1962(c) by conducting the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interested commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 18 U.S.C. § 1962(d);

- Violated 12 U.S.C.  § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2 by referring appraisal settlement services business to LandSafe (1) in exchange for control over the appraisal valuation process; and (2) without making the disclosures required by RESPA;

- Violated 12 U.S.C. § 2607(b) and Regulation X, 24 C.F.R. § 3500.14, by charging fees for appraisals that were never properly conducted;

- Engaged in acts prohibited by California Civil Code section 1090.5, including: (1) "[s]eeking to influence a person who prepares a valuation to report a minimum or maximum value for the property being valued," Cal. Civ. Code § 1090.5(a)(1); (2) "[w]ithholding or threatening to withhold timely payment to a person or entity that prepares a valuation, or provides valuation management functions, because that person or entity does not

17

1   return a value at or above a certain amount," *id.* at § 1090.5(a)(2); (3)

2   "[i]mplying to a person who prepares a valuation that current or future

3   retention of that person depends on the amount at which the person estimates

4   the value of the real property," *id.* at § 1090.5(a)(3); (4) "[e]xcluding a

5   person who prepares a valuation from consideration for future engagement

6   because the person reports a value that does not meet or exceed a

7   predetermined threshold," *id.* at § 1090.5(a)(4); and

8   • Violated the common law governing unjust enrichment by receiving a benefit

9   from Plaintiff and Class members in the form of appraisal fees, which fees

10   were unearned and unreasonable, not for services actually performed and

11   made in violation of federal and common law.

12   79.   Defendants' conduct as described herein violates not only the "unlawful"

13   prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong.

14   Defendants' conduct offends public policy and is immoral, unethical, oppressive,

15   unscrupulous and substantially injurious to consumers.  Any justification for Defendants'

16   practices is outweighed by the consequences and harm to Plaintiffs and the Class.  There

17   were reasonable alternatives available to Defendants to further Defendants' legitimate

18   business interests, other than the conduct described herein.

19   80.   Plaintiff and members of the Class have suffered injury-in-fact and have lost

20   money or property as a result of Defendants' unlawful, unfair and/or deceptive business

21   practices.  Each of Defendants' omissions was material to Plaintiff and members of the

22   Class in ordering and paying for the so-called "appraisals" at issue.

23   81.   Plaintiff and the members of the Class seek restitution and disgorgement of

24   profits realized by Defendants as a result of their unfair, unlawful and/or deceptive

25   practices.

26   82.   Defendants' conduct was also "fraudulent, misleading, or likely to deceive

27   the public" within the meaning of California Business and Professions Code

28   section 17200.

18

83.     Had the true nature of the fraudulent and phony appraisals been disclosed to Plaintiff and Class members, they would not have paid for the appraisals at issue.

84.     Plaintiff and members of the Class have been injured in fact and suffered a loss of money or property as a result of Defendants' fraudulent, unlawful, and unfair business practices.

85.     Defendants have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiff and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

86.     Additionally, under Business and Professions Code section 17203, Plaintiff and members of the Class seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct their actions.

## SECOND CLAIM FOR RELIEF
### Violations of the Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. § 1962(c))

87.     Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

88.     Plaintiff brings this cause of action on behalf of herself and the members of the Class.

### THE RICO ENTERPRISE

89.     Defendants Countrywide Financial, Countrywide Home Loans, FSL, Countrywide Bank, LandSafe, LandSafe Appraisal, and BofA are each persons within the meaning of Title 18 United States Code section 1961(3).

90.     At all relevant times, in violation of Title 18 United States Code section 1962(c), Defendants Countrywide Financial, Countrywide Home Loans, FSL, Countrywide Bank, LandSafe, LandSafe Appraisal, and BofA, including their directors, employees, and agents, conducted the affairs of an association-in-fact enterprise, as that

19

term is defined in Title 18 United States Code section 1961(4) (the "Countrywide Enterprise"). The affairs of the Countrywide Enterprise affected interstate commerce through a pattern of racketeering activity.

91. The Countrywide Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of generating the fraudulent and phony appraisals of the real property at issue in this case.

92. While the members of the Countrywide Enterprise participated in and are part of the enterprise, they also have an existence separate and distinct from the enterprise. The Countrywide Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Countrywide and the persons and/or entities procuring and preparing the fraudulent appraisals.

93. Operating the Countrywide Enterprise according to policies and procedures developed and established by its executives, Countrywide controlled and directed the affairs of the Countrywide Enterprise and used the other members of the Countrywide Enterprise as instrumentalities to carry out the fraudulent scheme to fraudulently, systematically and uniformly produce and charge borrowers for phony, inflated "appraisals" of properties in connection with home loans originated by Countrywide. These policies and procedures established by Countrywide's executives include refusing to utilize bona fide appraisers; paying above-market fees to those appraisers who inflated values above actual market values; rewarding appraisers who produced inflated appraisals; blacklisting, retaliating against, and firing appraisers who refused to engage in such corrupt conduct; requiring appraisers to rely upon information outside the relevant market to justify inflated valuations in appraisals; and providing appraisers with false sales information and comparables to ensure the production of inflated appraisals.

**THE PREDICATE ACTS**

94. The Countrywide Enterprise's scheme to fraudulently, systematically and uniformly produce and charge borrowers for phony, inflated "appraisals" of properties in

20

connection with home loans originated by Countrywide was facilitated by the use of the United States Mail and wire. The scheme constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

95.     In violation of Title 18 United States Code sections 1341 and 1343, the Countrywide Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers by obtaining money from them using false or fraudulent pretenses.

96.     18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice …"

97.     The Countrywide Enterprise's collective association and collective action in procuring and preparing fraudulent appraisals constitutes the RICO enterprise. Every member of the Countrywide Enterprise participated in the process of misrepresenting the true nature of the purported appraisals, thereby allowing them to increase their revenues. The Countrywide Enterprise earned millions of dollars in wrongful profits as a result.

98.     In perpetrating the fraudulent scheme, each member of the Countrywide Enterprise directly or indirectly through its corporate structure has designed and implemented a uniform scheme to prepare the fraudulent appraisals at issue here. The Countrywide Enterprise's making and communicating of false valuations of property comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

99.     The Countrywide Enterprise has knowingly, intentionally or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343, by knowingly and intentionally implementing the scheme to make false statements about the value of the

property that was securing their loans, which allowed the Countrywide Enterprise to reap unlawful profits.

100.   By devising the scheme or artifice to defraud consumers as described herein, the Countrywide Enterprise transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, ... writings, signs, signals, [and] pictures," "for the purpose of executing such scheme or artifice," including by: (i) transmitting phony statements about the values of the property securing their loans and (ii) transmitting e-mail communications relating to the process of determining, making or transmitting the phony property appraisals.

101.   Plaintiff is informed and believes that, in addition to the conduct described above, the Countrywide Enterprise used the wires in conjunction with reaching their agreement to make false statements about the values of the properties at issue here.

102.   Through the racketeering scheme described above, Defendants used the enterprise to improperly increase their profits to the detriment of consumers in different states.

103.   The Countrywide Enterprise organized and implemented the scheme, and ensured it continued uninterrupted by concealing their fraudulent appraisals from consumers, including Plaintiff.

104.   The Countrywide Enterprise knew the scheme would defraud borrowers, yet each member of the Countrywide Enterprise remained a participant despite the fraudulent nature of the enterprise. At any point while the scheme had been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence.  Rather than stopping the scheme, however, the members of the Countrywide Enterprise deliberately chose to continue it, to the direct detriment of consumers such as Plaintiff.  Plaintiff suffered injury resulting from the pattern of racketeering activity.

105.   Because Plaintiff unknowingly paid for a fraudulent appraisal, Plaintiff is a direct victim of the Countrywide Enterprise's wrongful and unlawful conduct.  Plaintiff's

injuries were direct, proximate, foreseeable and natural consequences of Defendants' conduct.  There are no independent factors that account for Plaintiff's economic injuries, and the loss of money satisfies RICO's injury requirement.

106.   Plaintiff, and members of the Class, are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs or suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

107.   As a direct and proximate result of the subject racketeering activities, Plaintiff and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting the Countrywide Enterprise from further engaging in their unlawful conduct.

108.   Under the provisions of Section 1964(c) of RICO, members of the Countrywide Enterprise are jointly and severally liable to Plaintiff and Class members for three times the damages that Plaintiff and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees

## THIRD CLAIM FOR RELIEF

**Violation of the Racketeer Influenced and Corrupt Organizations Act, Conspiracy to Violate Title 18 United States Code section 1962(c)**

**(18 U.S.C. § 1962(d))**

109.   Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

110.   Plaintiff brings this cause of action on behalf of herself and the members of the Class.

111.   As set forth above, in violation of Title 18 United States Code section 1962(d), members of the Countrywide Enterprise conspired to violate the provisions of Title 18 United States Code section 1962(c).

112.   As set forth above, Defendants, having directed and controlled the affairs of the Countrywide Enterprise, was aware of the nature and scope of the enterprise's

1 | unlawful scheme, and they agreed to participate in it.

2 |     113.  As a direct and proximate result, Plaintiff and the members of the Class have

3 | been injured in their business or property by the predicate acts which make up the

4 | Countrywide Enterprise's pattern of racketeering activity in that they were charged for

5 | fabricated and inflated appraisals.

6 | **FOURTH CLAIM FOR RELIEF**

7 | **Unjust Enrichment**

8 |     114.  Plaintiff incorporates by reference in this claim for relief each and every

9 | allegation of the preceding paragraphs, with the same force and effect as though fully set

10 | forth herein.

11 |     115.  Plaintiff brings this cause of action on behalf of herself and the members of

12 | the Class.

13 |     116.  By their wrongful acts, Defendants were unjustly enriched at the expense of

14 | Plaintiff and members of the Class.

15 |     117.  Defendants knowingly, fraudulently, systematically, and uniformly procured

16 | and prepared fabricated and inflated appraisals on home loans originated by Countrywide.

17 |     118.  Defendants then charged Plaintiff and members of the Class between $300

18 | and $600 for phony, fraudulent appraisals, which solely benefitted Defendants.

19 |     119.  Thus, Plaintiff and members of the Class were unjustly deprived.

20 |     120.  It would be inequitable and unconscionable for Defendants to retain the

21 | profit, benefit and other compensation they obtained from their fraudulent, deceptive, and

22 | misleading conduct alleged herein.

23 |     121.  Plaintiff and members of the Class seek restitution from Defendants, and

24 | seek an order of this Court disgorging all profits, benefits, and other compensation

25 | obtained by Defendants from their wrongful conduct..

26 | **FIFTH CLAIM FOR RELIEF**

27 | **Fraud**

28 |     122.  Plaintiff incorporates by reference in this claim for relief each and every

24

allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

123.   Plaintiff brings this cause of action on behalf of herself and the members of the Class.

124.   Defendants concealed and suppressed material facts, namely, the fact that they had created phony appraisals of real property in order to rapidly close real estate loans which were then sold to other investors.

125.   Plaintiff justifiably relied on the reasonable expectation that Defendants would act in compliance with the law, which included ordering and preparing legitimate appraisals of the real property they were purchasing or refinancing.

126.   Had the true nature of the Defendants' manipulation been disclosed to Plaintiff and members of the Class, they would not have paid for the phony appraisals.

127.   Defendants knew their concealment and suppression of materials facts was false, misleading, and were fully aware that the phony appraisals would be utilized by borrowers to make decisions concerning loan transactions.

128.   As a result of Defendants' fraudulent omissions and misrepresentations, Plaintiff and members of the Class have been injured in fact and suffered a loss of money or property.  Plaintiff and members of the Class would not have obtained and paid for phony appraisals in connection with their home loan transactions had it not been for Defendants' concealment of material facts.

129.   Plaintiffs and members of the Class justifiably relied upon Defendants' knowing, affirmative, and active concealment.  By concealing material information about their scheme to prepare phony appraisals, Defendants intended to induce Plaintiff and members of the Class into believing that the appraisals were legitimately prepared.

130.   As a direct and proximate result of Defendants' omissions and active concealment of material facts, Plaintiff and each member of the Class has been damaged in an amount according to proof at trial.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.     Certifying the Class, as requested herein, certifying Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel for the Class;

2.     Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged conduct discussed herein;

3.     Awarding Plaintiff and the members of the Class compensatory damages in an amount according to proof at trial;

4.     Awarding restitution and disgorgement of Defendants' revenues and/or profits to Plaintiff and members of the Class;

5.     Awarding Plaintiff and the members of the Class treble damages in an amount according to proof at trial;

6.     Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

7.     Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

8.     Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

9.     For such other and further relief as the Court deems just and proper.

Dated:  November 27, 2013

BARON & BUDD, P.C.

By: _____
     Roland Tellis

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
Isaac Miller (SBN 266459)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

Attorneys for Plaintiff
BARBARA WALDRUP, individually, and
on behalf of other members of the public
similarly situated

27

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial of her claims by jury to the extent authorized by law.

Dated:  November 27, 2013

BARON & BUDD, P.C.

By: _____
       Roland Tellis

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
Isaac Miller (SBN 266459)_
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

Attorneys for Plaintiff
BARBARA WALDRUP, individually, and
on behalf of other members of the public
similarly situated

CLASS ACTION COMPLAINT

COPY

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| BARBARA WALDRUP, individually, and on behalf of other members of the general public similarly situated | COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS; COUNTRYWIDE BANK, N.A.; BANK OF AMERICA CORPORATION; LANDSAFE, INC.; and LANDSAFE APPRAISAL, INC. |

| (b) County of Residence of First Listed Plaintiff    Harris County, TX | County of Residence of First Listed Defendant    LOS ANGELES |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| Daniel Alberstone (SBN 105275); Roland Tellis (SBN 186269)<br>BARON & BUDD, P.C.<br>15910 Ventura Boulevard, Suite 1600, Encino, CA 91436<br>Ph: (818)839-2333 / Fax: (818)986-9698 | |

| II. BASIS OF JURISDICTION (Place an X in one box only.) | | III. CITIZENSHIP OF PRINCIPAL PARTIES-For Diversity Cases Only<br>(Place an X in one box for plaintiff and one for defendant) | | | | | |
|---|---|---|---|---|---|---|---|
| | | | PTF | DEF | | PTF | DEF |
| ☐ 1. U.S. Government Plaintiff | ☒ 3. Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| | | Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| ☐ 2. U.S. Government Defendant | ☐ 4. Diversity (Indicate Citizenship of Parties in Item III) | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

| IV. ORIGIN (Place an X in one box only.) | | | | | |
|---|---|---|---|---|---|
| ☒ 1. Original Proceeding | ☐ 2. Removed from State Court | ☐ 3. Remanded from Appellate Court | ☐ 4. Reinstated or Reopened | ☐ 5. Transferred from Another District (Specify) | ☐ 6. Multi-District Litigation |

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ in excess of $5 mil.

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. section 1962(c)(d))

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 535 Death Penalty | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | **Other:** | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 862 Black Lung (923) |
| ☒ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | **FORFEITURE/PENALTY** | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **LABOR** | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 751 Family and Medical Leave Act | |
| | ☐ 220 Foreclosure | | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other<br>☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | CV13-08833 |
|---|---|---|

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No | [ ] Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?  Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?  Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| [ ] Yes  [X] No | [ ] Los Angeles | [ ] Los Angeles | Western |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, or San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [X] |
| Indicate the location in which a majority of defendants reside: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of claims arose: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |

**C.1. Is either of the following true? If so, check the one that applies:**

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?　　☒ NO　　☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?　　☒ NO　　☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)　　☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____　DATE: November 27, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge     Christina A. Snyder     and the assigned Magistrate Judge is     Carla Woehrle     .

The case number on all documents filed with the Court should read as follows:

## CV13-8833-CAS(CWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

November 27, 2013
_____
Date

By   C. Sawyer
_____
Deputy Clerk

---

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| | | |
|---|---|---|
| [x] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---