1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Isaac Miller (SBN 266459)
imiller@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:   (818) 986-9698

Attorneys for Plaintiff
BARBARA WALDRUP, individually, and
on behalf of other members of the public
similarly situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA WALDRUP, individually, and on behalf of other members of the general public similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE HOME LOANS, a New York corporation, COUNTRYWIDE BANK, N.A., a national association, BANK OF AMERICA CORPORATION, a Delaware corporation, LANDSAFE, INC., a Delaware corporation, LANDSAFE APPRAISAL, INC., a California Corporation,<br><br>Defendants. | Case Number:  2:13-CV-08833-CAS-CW<br><br>**CLASS ACTION**<br><br>**THIRD AMENDED COMPLAINT FOR:**<br><br>(1)  Violations of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.);<br><br>(2)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c));<br><br>(3)  Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d));<br><br>(4)  Fraud; and<br><br>(5)  Unjust Enrichment<br><br>**Jury Trial Demanded** |

For her Third Amended Complaint against Defendants Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, N.A. (together, "Countrywide"), Bank of America Corporation ("BofA"), LandSafe, Inc., LandSafe Appraisal, Inc. (together, "LandSafe") (collectively, "Defendants"), Plaintiff Barbara Waldrup ("Plaintiff"), individually, and on behalf of all other members of the public similarly situated, based on information and belief, alleges as follows:

## NATURE OF THE ACTION

1.     This case concerns a devious scheme perpetrated by Defendants to circumvent legal obligations imposed on Countrywide and BofA, as federally insured and regulated financial institutions, to perform real estate appraisals in accordance with the strict ethical and competency rules of the Uniform Standards of Appraisal Practice ("USPAP"), in connection with the sale and refinancing of single family homes during the period January 1, 2003 to December 31, 2008.  The scheme allowed Defendants to eliminate the delay associated with performing and fulfilling the strict requirements of a USPAP appraisal, and rapidly close loans, all to the financial detriment of consumers who were forced to pay for legally-mandated USPAP "appraisals" that were never performed. In the end, through their uniform practice of systematically corrupting the appraisal process in connection with loans originated by Countrywide, Defendants produced so-called "appraisal reports" which were *not* legitimate opinions of the value of property. Rather, they were reports of a predetermined value that favored Countrywide's cause of rapidly closing loans

2.     During the period 2003 to 2008, Countrywide became the largest home mortgage lender in the United States, having originated over $400 billion in loans each year.  In addition to its thriving loan origination and service business, Countrywide also became a leader in the securitization of home loans.  Along the way, Countrywide reaped hefty profits based on the quantity, not on the quality, of the loans it successfully originated and sold to Wall Street investors.

3.     Recognizing that it needed to close as many loans as possible to maintain its hefty profit margins, Countrywide began removing the "toll gates" that slowed or obstructed the loan origination process.  One of those "toll gates" was the ever important appraisal.

4.     Obtaining an appraisal is a critical element of the home buying or refinancing process because it provides a buyer or homeowner with an accurate, objective  and supportable opinion of a property's value, and it protects the financial and public policy interests in real estate transactions involving federally-regulated and federally-insured institutions like Countrywide and BofA.  In that regard, Title XI of the Financial Institutions Reform Act of 1989 ("FIRREA") *requires* financial institutions like Countrywide and BofA to obtain regulated appraisals, performed in strict compliance with USPAP's ethical and competency requirements, in connection with a sale or refinancing of property.

5.     At the core of the applicable federal and state laws, as well as the ethics and competency rules of USPAP, is the requirement that professional appraisers be fully independent and objective in reaching their opinions of value.

6.     Because the legally-mandated USPAP appraisal had the potential to delay or terminate a prospective loan transaction and, thus, limit Countrywide's ability to securitize and sell such loans to Wall Street, Countrywide opted for a different course of action.

7.     As part of the lending transaction, Countrywide required that borrowers use LandSafe as its "approved" USPAP appraisal vendor.  In reality, LandSafe was Countrywide's captive, wholly-owned subsidiary over which Countrywide exerted complete dominion and control and, through LandSafe, Countrywide controlled the process and outcome of the so-called USPAP appraisal, a fact not disclosed to prospective borrowers and homeowners.

8.     Countrywide and LandSafe agreed to knowingly, fraudulently, systematically and uniformly produce phony so-called USPAP "appraisals" on home loans originated by

Countrywide which were not performed in accordance with required USPAP standards

9.    To do so, LandSafe, at Countrywide's behest, employed a uniform practice of engaging in systematic, unlawful conduct with respect to the preparation of all appraisals for Countrywide loans originated from 2004 through 2008, which was designed to ensure that appraisal reports contained an inflated or manipulated property "value" which always exceeded the Countrywide loan amount, regardless of the true value of the property.  In furtherance of this uniform practice, LandSafe and Countrywide engaged in conduct which included:

- refusing to utilize bona fide, independent appraisers to prepare the legally mandated USPAP appraisals;
- paying generous fees to, and otherwise rewarding, a select list of appraisers who agreed to disregard USPAP's ethical and competency rules;
- paying generous fees to, and otherwise rewarding, a select list of appraisers who agreed to inflate property values or otherwise participate in the fraudulent scheme;
- blacklisting and otherwise retaliating against appraisers who refused to disregard the "independence" of the USPAP appraisal process, who refused to inflate property values, or who refused to otherwise participate in the fraudulent scheme; and
- withholding information from appraisers to ensure the creation of phony so-called USPAP appraisals.

10.    In effect, through their uniform practice of systematically corrupting the appraisal process, Defendants produced so-called "appraisal reports" which were *not* legitimate opinions of value.  Rather, they were reports of a predetermined value that favored Countrywide's cause of rapidly closing loans.

11.    And, although obtaining an USPAP appraisal was an obligation imposed on Defendants, they nevertheless sought to pass on the cost of doing so to borrowers.  Thus,

adding insult to injury, Countrywide and LandSafe falsely represented to borrowers that they had performed "appraisals" on their properties which complied with the applicable legal and ethical USPAP standards and then required borrowers to *pay* between $300 and $600 for these so-called USPAP "appraisals."  In the end, however, Countrywide charged borrowers for a legally-mandated USPAP appraisals that were never performed.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the class of plaintiffs are citizens of states different from Defendants.  Further, greater than two-thirds of the members of the Class reside in states other than the states in which Defendants are citizens.

13.     This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.  This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965.  In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law and common law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiff ordinarily would expect to try them in one judicial proceeding.

14.     Venue lies within this judicial district under 28 U.S.C. § 1391(b), (c) and (d), and under 18. U.S.C. § 1965, because each of the Defendants transacted business in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims in this lawsuit occurred, among other places, in this District.

## PARTIES

15.     Plaintiff Barbara Waldrup is an individual residing in Houston, Texas and is a citizen of the State of Texas.

16.     Defendant Countrywide Financial Corporation ("Countrywide Financial") is a Delaware corporation registered to do business throughout the United States. Countrywide Financial, through its subsidiaries Countrywide Home Loans and Countrywide Bank, was engaged in mortgage lending.  It was at all relevant times the

publicly traded parent and holding company of the Countrywide family of companies, which had their principal place of business and national headquarters at 4500 Park Granada, Calabasas, County of Los Angeles, California.

17. Defendant Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a New York corporation with its principal place of business and national headquarters at 4500 Park Granada, Calabasas, County of Los Angeles, California. It was at all relevant times a wholly owned and controlled subsidiary of Countrywide Financial and engaged in the business of originating mortgage loans.

18. Countrywide Home Loans operated a division called Full Spectrum Lending, Inc. ("FSL") which also had its headquarters at 4500 Park Granada, Calabasas, County of Los Angeles, California. FSL was devoted to sub-prime lending and, on December 2004, FSL was merged into Countrywide Home Loans and became one of its internal divisions.

19. Defendant Countrywide Bank, N.A. ("Countrywide Bank") is a national banking association headquartered at 1199 North Fairfax Street, Suite 500, Alexandria, Virginia 22314. Countrywide Bank is a wholly-owned and controlled subsidiary of Countrywide Financial and funds the loans originated by Countrywide Home Loans.

20. Plaintiff is informed and believes that Countrywide Financial Corporation, Countrywide Home Loans and Countrywide Bank (collectively referred to herein as "Countrywide") together concocted the appraisal scheme alleged herein, and all stood to gain financially from the fraudulent appraisal scheme alleged herein.

21. Defendant Bank of America Corporation ("BofA") is a Delaware Corporation, a bank holding company, and a financial holding company. Its principal executive offices are located at 100 N. Tyron Street, Charlotte, North Carolina.

22. On July 1, 2008, Countrywide Financial, and its subsidiaries including Countrywide Home Loans and Countrywide Bank, merged with Defendant BofA and, as a result, BofA became a successor-in-interest to the Countrywide family of businesses, including Countrywide Financial, Countrywide Home Loans and Countrywide Bank, and assumed liability for their conduct alleged herein.

23.     In the months following the merger, BofA executed a plan to integrate Countrywide's businesses into BofA through a series of transactions by which BofA would acquire control over all of Countrywide's operations.

24.     In April 2009, BofA informed the Federal Reserve that it would "run the combined mortgage business" under the "Bank of America brand" and that Calabasas, California, in Los Angeles County, would be the "the national headquarters for the combined mortgage business."

25.     Bank of America integrated the former mortgage-origination business of Countrywide Financial, including Countrywide Bank and Countrywide Home Loans, into its own mortgage business and externally branded it as "Bank of America Home Loans." Countrywide employees became BofA employees, and BofA announced that it "ended up with the largest [mortgage] servicing platform in the country."

26.     An April 27, 2009 BofA press release noted that "[t]he Bank of America Home Loans brand represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans, which Bank of America acquired on July 1, 2008."

27.     In the months following the Countrywide-BofA merger, BofA executives and spokespersons made public statements that Countrywide's liabilities were factored into BofA's purchase, and that BofA intended to "clean[] up" those liabilities.

28.     In a 2008 interview with the New York Times, BofA's former CEO confirmed that "We looked at every aspect of the [Countrywide] deal, from their assets to potential lawsuits and we think we have a price that is a good price."

29.     On March 1, 2009, a BofA spokesperson stated that "We bought [Countrywide] and all of its assets and liabilities . . .  We are aware of the claims and potential claims against the company and have factored those into the purchase."

30.     Likewise, BofA's Form 10-K for 2009 acknowledges that "we face increased litigation risk and regulatory scrutiny as a result of the . . .  Countrywide acquisitions."

31.     In November 2010, BofA's current CEO addressed potential litigation arising

from Countrywide's operations and stated "[t]here's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we will pay for the things that Countrywide did."  One month later, he again confirmed to the New York Times that "Our company bought it and we'll stand up, we'll clean it up."

32.     Plaintiff is informed and believes that, in addition to BofA's successor liability for Countrywide's conduct alleged herein, BofA also continued the conduct alleged herein after its acquisition of Countrywide in July 1, 2008 through the end of the class period on December 31, 2008.

33.     Defendant LandSafe, Inc. ("LandSafe") is a Delaware corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024.  LandSafe provides loan closing products and services such as credit reports and appraisals.

34.     Defendant LandSafe Appraisal Services, Inc. ("LandSafe Appraisal") is a California corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024. LandSafe Appraisal is a wholly-owned and controlled subsidiary of LandSafe, Inc. with shared management and employees, and purports to offer appraisal services in connection with mortgage loan closings.  LandSafe and LandSafe Appraisal are collectedly referred to herein as "LandSafe."

35.     Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

# FACTUAL BACKGROUND

## A. Real Estate Appraisal Standards

36.  An appraisal is an integral part of a real estate loan transaction. It provides a borrower or homeowner with the means to obtain an opinion of value from a licensed and qualified specialist. It also provides protection for financial and public policy interests in real estate transactions with federally-insured financial institutions like Countrywide and BofA.

37.  Appraisals are typically governed by a number of uniform standards, regulations and laws.

38.  In 1989, Congress adopted Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). See 12 U.S.C. §§ 3331 *et seq.* (hereafter "Title XI"). Title XI *requires* federally-insured financial institutions like Countrywide and BofA to obtain a written appraisal that strictly conforms to USPAP standards in connection with any real property insured by the Federal Housing Administration ("FHA"). See 12 U.S.C. § 1708(f). Federal law also requires that such appraisals "be performed in accordance with uniform standards, by individuals who have demonstrated competence and whose professional conduct is subject to effective supervision." *Id.* at § 1708(f)(1). Additionally, such USPAP appraisals "shall be performed in accordance with generally accepted appraisal standards," and each appraisal is to be a written statement that is "independently an[d] impartially prepared by a licensed or certified appraiser setting forth an opinion of defined value of an adequately described property as of a specific date, supported by presentation and analysis of relevant market information." 12 U.S.C. § 1708(f)(1)(A), (B).

39.  The USPAP requires appraisers to conduct their appraisals independently and competently: "An appraiser must perform assignments with impartiality; objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule. USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes

the reporting of predetermined opinions and conclusions." *Id.*

40.    The USPAP also requires that an appraiser communicate the result of an appraisal in a manner "that is not misleading."  The purpose of this rule is to ensure that "the client and any intended users whose expected reliance on an appraisal may be affected by the extent of the appraiser's investigation are properly informed and are not misled as to the scope of work."  *Id.*  In this regard, the appraiser's "scope of work" must include the research and analyses necessary to develop credible assignment results.  To that end, an appraiser must not "exclude any information or procedure that would appear to be relevant to the client, an intended user, or the appraiser's peers in the same or a similar result."  *Id.*  Additionally, an appraiser "must not allow assignment conditions or other factors to limit the extent of research or analysis to such a degree that the resulting opinions and conclusions developed in an assignment are not credible in the context of the intended use of the appraisal."  *Id.*

41.    The USPAP further provides that it is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

a.    the reporting of a predetermined result (e.g., opinion of value);

b.    a direction in assignment results that favors the cause of the client;

c.    the amount of a value opinion;

d.    the attainment of a stipulated result; or

e.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

42.    In addition, each USPAP appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.  *Id.*

9

THIRD AMENDED CLASS ACTION COMPLAINT

43.     The USPAP standards are incorporated into federal law, 12 C.F.R. § 34.44. Such law provides that an in-house or staff appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45.  And, for appraisers who are independent contractors or "fee" appraisers, the regulation similarly requires that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

44.     Appraisers and appraisals are also regulated by state laws, including California Civil Code Section 1090.5 which provides, in pertinent part, that: "(a) No person with an interest in a real estate transaction involving a valuation shall improperly influence or attempt to improperly influence the development, reporting, result, or review of that valuation, through coercion, extortion, bribery, intimidation, compensation, or instruction."

## B.     Countrywide's Fraudulent Appraisal Scheme

45.     Commencing in 2003, Countrywide produced hundreds of billions of dollars in loans annually and had a residential mortgage servicing portfolio in excess of $1 trillion.

46.     Countrywide originated mortgages through its retail operations, primarily branded as "Countrywide Home Loans," where Countrywide acted as the loan broker (through Countrywide Home Loans) and the lender (through Countrywide Bank). Countrywide also had a large on-line mortgage origination business and, through an entity called Full Spectrum Lending, Inc. ("FSL"), engaged in sub-prime lending.

47.     As the real estate market grew exponentially during the early 2000's, Countrywide's lending and loan servicing business grew rapidly.  By 2004, Countrywide had become the largest mortgage lender in the United States and, to fuel its appetite for profit, Countrywide began loosening its underwriting efforts to rapidly close and sell loans to the secondary market.  To that end, Countrywide viewed the appraisal process as

a speed bump in the road to closing a loan.

48.     From at least 2004 and continuing through at least 2007, Countrywide maintained a database entitled "Field Review List" which contained the names of "independent" appraisers who were blacklisted by Countrywide because they refused to participate in the fraudulent scheme.. And, to further address the "problem" of "independent" appraisers impeding Countrywide's ability to rapidly originate and sell loans, Countrywide targeted and developed an affiliation with LandSafe. Through LandSafe, Countrywide could (1) use its market size to pressure appraisers to disregard the appraisal "independence" requirements and permit Countrywide to rapidly close a loan; (2) punish appraisers who refused to "play ball;" and (3) use fraudulent appraisal "reviews" to revise legitimate appraisals to arrive at values needed to close a loan. Indeed, given Countrywide's significant mortgage lending business, LandSafe had a strong financial incentive to play by Countrywide's rules.

49.     On May 13, 2009, a whistleblower named Kyle Lagow ("Lagow") filed a sealed complaint against Countrywide, LandSafe, BofA and others for damages and civil penalties under the False Claims Act in the United States District Court for the Eastern District of New York. In May 2012, Lagow's complaint was finally unsealed and Defendants' phony appraisal scheme was exposed.

50.     Lagow's unsealed complaint contains detailed allegations concerning his first-hand knowledge of Defendants' corrupt appraisal conduct. According to Lagow's unsealed complaint, from June 2004 until November 2008, Lagow was employed by LandSafe, Inc. in Plano, Texas as one of the company's original supervisory home appraisers. He was promoted to Field Valuation Manager, then Area Manager, and ultimately Assistant Vice President, Area Appraisal Manager.

51.     Lagow's unsealed complaint alleged that during his tenure at LandSafe, he had direct exposure to the false statements, records and/or claims made by LandSafe, its affiliate Countrywide Home Loans, FSB, Countrywide Bank and their parent Countrywide Financial. Lagow witnessed first-hand Defendants' corruption of the

appraisal process in a variety of ways, including by: (1) knowingly and fraudulently inflating, and causing inflation of property appraisals on, among others, FHA-backed loans; (2) refusing to supply bona fide appraisers with documents and other materials necessary for appraisals; (3) paying above-market fees to those appraisers who disregarded the appraisal independence requirements in contravention of the law ; (4) rewarding appraisers who produced corrupt appraisals and appraisal reviews at a rate of as many as 400 per month; (5) blacklisting, retaliating against, auditing, and firing appraisers who refused to corrupt their appraisal reports in contravention of the law; (6) requiring appraisers to rely upon information outside the relevant market to justify manipulated valuations in the subject appraisals; (7) providing appraisers with false sales information, not reflecting concessions made by sellers at the time of closing, further corrupting the use of comparables to complete legitimate appraisals; and (8) retaliating against persons who questioned or criticized the pattern and practice of preparing illegitimate appraisals.

52.     According to Lagow's unsealed complaint, LandSafe utilized two distinct appraisal mechanisms.  First, it would assign appraisal requests for Countrywide wholesale or retail loans to either outside "fee" appraisers or its "staff" appraisers.  These outside "fee" appraisers were pressured to "play ball"  through threats of blacklisting; and the staff appraisers were pressured directly by their employer, LandSafe, to generate a manipulated, illegitimate appraisal, as necessary to close a deal.  Second, it would "review" all appraisals for Countrywide loans ostensibly as a quality control measure. However, in reality, the "review" mechanism was a sham created by Defendants to: (1) create the illusion of a robust underwriting process to verify property values; (2) allow for rewriting and inflating of any appraisal valuations that, if left undisturbed, would prevent the associated loan from closing; and (3) allow Defendants to market this sham "review" mechanism and thereby mislead investors and regulators into believing its assets were more secure and less in need of oversight than competitor products.

53.     According to Lagow's unsealed complaint, when he started at LandSafe in 2004, he was immediately placed in a supervisory position over a team of staff appraisers

whose primary purpose was to perform appraisals on loans originated by Countrywide. His responsibility was to hire and train new staff appraisers in multiple states and to directly supervise these appraisers in their completion of appraisals on Countrywide loans. During his tenure at LandSafe, Lagow opened new markets for the company, hiring teams of appraisers to handle Countrywide's loans across Utah, Colorado, Arizona, Louisiana, Texas and Oklahoma.

54.    As a supervising appraiser and ultimately Assistant Vice President and Area Manager, Lagow was involved in many communications between the LandSafe staff appraisers and Countrywide.  He was also directly involved in communications between Countrywide loan originators, through LandSafe, to fee appraisers.  In addition, Lagow was given a supervisory position over so-called review appraisers.

55.    According to Lagow's unsealed complaint, early in his tenure at LandSafe, he personally observed Countrywide and LandSafe's manipulation of the appraisal process, a manipulation intended to help fill the mortgage origination pipeline.  For example, in early 2005, Lagow attended a meeting with LandSafe President Todd Baur and a group of other appraisal managers.  Baur told the appraisal managers, including Mr. Lagow that: (1) that they needed to quit thinking of an appraisal as a separate unit; (2) LandSafe appraisers were there to help facilitate a Countrywide loan closing; and (3) they needed to change their thought process, the clear implication being that they needed to stop thinking like appraisers and think instead like lenders trying to close a loan.  Lagow and his colleagues came to understand from Baur that the appraisal manager's job at LandSafe was to make sure that appraisals did not derail Countrywide's loans.

56.    By early 2006, Lagow had identified that Countrywide and LandSafe were exerting control over the home valuation process which resulted in manipulated appraisals which, in turn, led to routinely inflated mortgages with actual loan-to-value ratios as high as 115%  -- far above the 97% permitted by the FHA insurance program -- which in turn was leading to increased foreclosures.

57.     According to Lagow, just prior to his termination in late 2008, he learned of a formal internal audit of LandSafe's fraudulent appraisal practice conducted by a Senior Vice President at LandSafe.  The audit found that the appraisals conducted by LandSafe were pre-textual, and the appraisal reports *always* communicated an inflated value necessary for Countrywide to close a loan.  Despite these audit results, LandSafe continued its uniform practice of systematically preparing and charging for illegitimate appraisals at Countrywide's request.

## C.     Defendants Defraud Plaintiff *Twice*

58.     On or about July 16, 2004, Plaintiff applied for a loan with Countrywide Home Loans, through its FSL sub-prime division, in connection with her purchase of a home in Houston, Texas.  Plaintiff dealt primarily with Countrywide loan officer Shawna Oakley, though Plaintiff also received communications from Ms. Oakley's colleagues and/or staff who did not identify themselves by name.  Plaintiff is informed and believes that as part of Defendants' uniform practice of systematically corrupting the appraisal process in connection with loans originated by Countrywide, Ms. Oakley and her colleagues were authorized by Countrywide to provide Plaintiff with loan-related documents, including a loan application, Disclosure Statements, Good Faith Estimates, HUD-1 Settlement Statements, appraisals, and other loan-related documents, which contained the misrepresentations and omissions at issue in this case.

59.     In most instances, the documents Plaintiff received were standard form statements or agreements which were prepared on Countrywide or LandSafe's letterhead and stationary, and which contained their official corporate logos.  However, many of the standard form agreements were not physically signed by a Countrywide or LandSafe representative, making it impossible for Plaintiff to identify the specific corporate representative who sent such documents.  Nevertheless, the representations and omissions that are the subject of this case were made by Countrywide and LandSafe through agents who were authorized to act on their behalf.  In this regard, Plaintiff has identified below the names of the Countrywide and LandSafe loan officers and appraisers with whom she

1    had dealings, and who provided her with the official business records that are the subject
2    of this case.

3        60.    Countrywide Home Loans and FSL were federally-insured and federally-
4    regulated financial institutions and, as such, were required to obtain a USPAP appraisal in
5    connection with Plaintiff's loan transaction.  However, Countrywide Home Loans and
6    FSL were not themselves prepared to pay the cost of obtaining this legally-mandated
7    appraisal.  In that regard, in connection with Defendants' unlawful practices, in early to
8    mid-July 2004, Ms. Oakley, on behalf of Countrywide Home Loans, through FSL,
9    provided Plaintiff with certain loan-related documents, including certain Disclosure
10   Statements, Good Faith Estimates, and HUD-1 Settlement Statements, which represented
11   to Plaintiff that "Lender may require *you* to use the services of an affiliated . . . real estate
12   appraiser, *as a condition of your loan on this property*, to represent the Lender's interests
13   in the transaction."   (emphasis added.)

14       61.    To that end, as part of Defendants' uniform scheme to unlawfully charge
15   homeowners like Plaintiff for appraisal reports containing an inflated or manipulated
16   property "value" which always exceeded the Countrywide loan amount, regardless of the
17   true value of the property, in the loan-related documents provided to Plaintiff,
18   Countrywide Home Loans, via FSL, informed Plaintiff that LandSafe Appraisal, Inc. was
19   its sole appraisal provider and that *Plaintiff* would be charged an estimated sum of $200-
20   $450 for this legally-mandated USPAP appraisal.

21       62.    On or about July 16, 2004, in accordance with its uniform practice of passing
22   on the cost of the legally-mandated USPAP appraisal to borrowers, Ms. Oakley or her
23   colleagues provided Plaintiff with loan-related documents in which Countrywide Home
24   Loans represented to Plaintiff that, in connection with the closing of her loan, she would
25   incur the sum of $400.00 for the required "appraisal" performed by LandSafe.

26       63.    On or about July 22, 2004, in furtherance of Defendants' unlawful appraisal
27   scheme, LandSafe, through its agents, including Barry Johnson of William & Stuart
28   Appraisal Corporation, prepared a document for Plaintiff entitled "Uniform Residential

Appraisal Report" on Plaintiff's property which falsely represented that it had been prepared "in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP) as approved by the Appraisal Standards Board of the Appraisal Foundation; the requirements to Title XI of the Financial Institution Reform, Recovery and Enforcement Act of 1989 (FIRREA); the Uniform Standards of Professional Appraisal Practice and the Code of Professional Ethics of the Appraisal Institute; all applicable state licensing and certification requirements; and all applicable Supplemental Standards." (hereafter the "2004 Appraisal").  Plaintiff is informed and believes that Mr. Johnson and William & Stuart Appraisal Corporation were authorized by Landsafe, as part of Defendants' scheme, to make the representations and omissions contained in Plaintiff's 2004 Appraisal.

64.    Plaintiff is informed and believes that in connection with the scheme, LandSafe, from its offices in Plano, Texas, sent, via U.S. Mail or an interstate carrier such as Federal Express, the 2004 Appraisal to Countrywide Home Loans, c/o Ms. Oakley, and Countrywide Home Loans, and then transmitted the 2004 Appraisal, via U.S. Mail or an interstate carrier such as Federal Express, to Plaintiff.  Plaintiff also recalls receiving a copy of the 2004 Appraisal from Ms. Oakley during an in-person meeting in connection with the closing of her loan transaction.  Plaintiff is informed and believes that LandSafe also transmitted the 2004 Appraisal directly to Plaintiff via U.S. Mail or an interstate carrier such as Federal Express.

65.    In furtherance of Defendants' uniform scheme to unlawfully charge homeowners like Plaintiff for appraisal reports containing an inflated or manipulated property "value" which always exceeded the Countrywide loan amount, regardless of the true value of the property, neither Countrywide Financial, Countrywide Home Loans, Countrywide Bank nor LandSafe, nor their agents identified above, disclosed to Plaintiff that the 2004 Appraisal was not prepared according to USPAP standards, regulations and laws governing appraisals and, thus, was illegitimate and violated Title XI, FIRREA, FHA requirements, and state law, among others.  Instead, they concealed their fraudulent

1  appraisal scheme.

2      66.    In reliance on the above misrepresentations and concealments by

3  Countrywide Financial, Countrywide Home Loans, Countrywide Bank and LandSafe,

4  Plaintiff paid the subject "appraisal" fee for the legally-mandated 2004 Appraisal.

5      67.    Plaintiff is informed and believes that Countrywide and LandSafe shared

6  some portion of the fee that Plaintiff paid for the 2004 Appraisal.

7      68.    On or about June 6, 2007, Plaintiff applied to refinance her home loan

8  through Countrywide Home Loans, Inc.  Plaintiff is informed and believes that she dealt

9  with Countrywide loan officers or agents Kerry Hunt and Christopher Rollman.   Plaintiff

10  is informed and believes that Messrs. Hunt and Rollman were authorized by Countrywide,

11  as part of the scheme, to provide Plaintiff with loan-related documents, including a loan

12  application, Disclosure Statements, Good Faith Estimates, HUD-1 Settlement Statements,

13  appraisals, and other loan-related documents, which contained the misrepresentations and

14  omissions at issue in this case.

15      69.    Once again, Countrywide Home Loans, as a federally-insured and federally-

16  regulated financial institution, was required to obtain a USPAP appraisal in connection

17  with Plaintiff's refinance transaction.  Again, Countrywide Home Loans represented to

18  Plaintiff that, the required USPAP appraisal would be performed by LandSafe Appraisal

19  Services, Inc., its sole "approved" appraisal vendor.

20      70.    On or about June 28, 2007, Countrywide Home Loans again sought to pass

21  the cost of the legally-mandated USPAP appraisal to Plaintiff and, to that end, represented

22  to Plaintiff that she would incur the sum of $320.00 for the required "appraisal"

23  performed by LandSafe.

24      71.    On or about July 3, 2007, LandSafe, through its agents, including Landsafe

25  Senior Appraiser David K. Dotson, prepared a document for Plaintiff entitled "Uniform

26  Residential Appraisal Report" on Plaintiff's property which falsely represented that it had

27  been prepared "in accordance with the requirements of the Uniform Standards of

28  Professional Appraisal Practice that were adopted and promulgated by the Appraisal

17

Standards Board of the Appraisal Foundation." (hereafter the "2007 Appraisal"). Plaintiff is informed and believes that Mr. Dotson was authorized by Landsafe, as part of the scheme, to make the representations and omissions contained in the 2004 Appraisal.

72. Plaintiff is informed and believes that in connection with the scheme, LandSafe, though its agents identified above, from its offices in Plano, Texas sent, via U.S. Mail or an interstate carrier such as Federal Express, the 2007 Appraisal to Countrywide Home Loans c/o Christopher Rollman. Indeed, an Order Form for the 2007 Appraisal identifies the "client" collectively as "COUNTRYWIDE-FSLD/LandSafe Appraisal Services" c/o Christopher Rollman. Similarly, the 2007 Appraisal is addressed collectively to "COUNTRYWIDE-FSLD/LandSafe Appraisal Services" and Plaintiff. Plaintiff is informed and believes that Countrywide Home Loans then transmitted, via U.S. Mail or an interstate carrier such as Federal Express, the 2007 Appraisal to Plaintiff. Plaintiff is informed and believes that LandSafe also transmitted the 2007 Appraisal directly to Plaintiff via U.S. Mail or an interstate carrier such as Federal Express.

73. On or about July 4, 2007, Countrywide Home Loans represented to Plaintiff, as it did to other members of the Class (as defined below), that LandSafe had performed a Uniform Residential Appraisal Report of Plaintiff's home, and, in connection with the consummation of Plaintiff's refinancing transaction, Countrywide Home Loans represented to Plaintiff that she would be charged an "appraisal" fee of $320.00 for the legally-mandated 2007 Appraisal.

74. Neither Countrywide Financial, Countrywide Home Loans, Countrywide Bank nor LandSafe, nor their agents identified above, disclosed to Plaintiff that the 2007 Appraisal was not prepared according to uniform standards, regulations and laws governing appraisals and was not an independent and objective valuation of the property, and, thus, was illegitimate and violated Title XI, FIRREA, FHA requirements, and state law, among others. Instead, they concealed their fraudulent scheme to manipulate and inflate her appraisal.

75. In reliance on the above misrepresentations and concealments by

Countrywide Financial, Countrywide Home Loans, Countrywide Bank and LandSafe, Plaintiff paid the subject "appraisal" fee for the 2007 Appraisal.

76.     Plaintiff is informed and believe that Countrywide and LandSafe shared some portion of the fee that Plaintiff paid for the 2007 Appraisal.

77.     Plaintiff is informed and believes that both the 2004 Appraisal and the 2007 appraisal were illegitimate, unsupported and violated USPAP, Title XI, FIRREA, FHA requirements, and state law, among others, because they were conducted pursuant to Defendants' above-described uniform practice of engaging in systematic, unlawful conduct with respect to the preparation of all appraisals for Countrywide loans during the period 2004 to 2008, which was designed to ensure that appraisal reports contained an inflated or manipulated property "value" which always exceeded the Countrywide loan amount, regardless of the true value of the property.

78.     Thus, the appraisal reports Plaintiff received not only falsely stated that they were USPAP appraisals, in fact, they were not "appraisals" at all.  In that regard, through their uniform practice of systematically corrupting the appraisal process in connection with loans originated by Countrywide, Defendants produced so-called "appraisal reports" which were *not* legitimate opinions of the value of Plaintiff's property.  Rather, they were reports of a predetermined value that favored Countrywide's cause of rapidly closing loans.

## TOLLING OF THE STATUE OF LIMITATIONS

79.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment, and misleading actions, as alleged herein.  Plaintiff and members of the Class, as defined below, were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiff and members of the Class could not reasonably have discovered the true nature of the Defendants' fraudulent appraisal scheme.

80.     Defendants knowingly, affirmatively, and actively concealed the true character, quality, and nature of their fraudulent appraisal scheme.  Plaintiff and members

of the Class reasonably relied upon Defendants' knowing, affirmative, and active concealment.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation as a defense in this action.

81.     The causes of action alleged herein did or will only accrue upon discovery of the true nature of the charges assessed against borrowers' accounts, as a result of Defendants' fraudulent concealment of material facts.  Plaintiff and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the unlawful conduct alleged herein.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action, on behalf of herself, and all others similarly situated, as a class action under Rule 23 of the Federal Rules of Civil Procedure.

83.     Plaintiff seeks to represent a Class defined as follows:

> All residents of the United States of America who, during      the period January 1, 2003 through December   31, 2008, obtained an appraisal from LandSafe     in   connection   with   a   loan originated by Countrywide.

84.     Plaintiff reserves the right to amend the Class definitions if discovery and further investigation reveals that the Class should be expanded or otherwise modified.

85.     Plaintiff reserves the right to establish sub-classes as appropriate.

86.     This action is brought and properly may be maintained as a class action under the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), (b)(2) or (b)(3), and satisfies the requirements thereof.  As used herein, the term "Class Members" shall mean and refer to the members of the Class.

87.     <u>Numerosity</u>:  While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants.  At this time, Plaintiff is informed and believes that the Class includes hundreds of thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule

23(a)(1), and the resolution of their claims through the procedure of a class action will be of benefit to the parties and the Court.

88.    Ascertainability:  Some names and addresses of members of the Class are available from Defendants' records, and others can be ascertained through appropriate notice.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under California state law and federal law.

89.    Typicality:  Plaintiff's claims are typical of the claims of the other members of the Class which she seeks to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiff and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

90.    Adequacy:  Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class, because she has no interests which are adverse to the interests of the members of the Class.  Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

91.    Superiority: A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)    The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action.

(b)    If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

THIRD AMENDED CLASS ACTION COMPLAINT

(c)    Absent a class action, Defendants likely would retain the benefits of their wrongdoing, and there would be a failure of justice.

92.    Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

93.    The common questions of fact include, but are not limited to, the following:

(a)    Whether Defendants engaged in unlawful, unfair, misleading, or deceptive business acts or practices in violation of California Business & Professions Code sections 17200 *et seq.*;

(b)    Whether Defendants engaged in a pattern or practice of racketeering, as alleged herein;

(c)    Whether Defendants were members of, or participants in the conspiracy alleged herein;

(d)    Whether Plaintiff and members of the class sustained damages, and if so, the appropriate measure of damages; and

(e)    Whether Plaintiff and members of the Class are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

94.    In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants;

(b)    The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or

impede their ability to protect their interests; and

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

95.    Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

### FIRST CLAIM FOR RELIEF
### Violation of Unfair Competition Law
### (California Business & Professions Code §§ 17200 *et seq.*)

96.    Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

97.    Plaintiff brings this cause of action on behalf of herself and the members of the Class.

98.    California Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."  For the reasons described above, Defendants have engaged in unfair, or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200 *et seq*.

99.    Through the scheme, Defendants have (1) directly and indirectly employed a scheme, device and artifice to defraud and mislead borrowers and defraud any person; (2) directly and indirectly engaged in an unfair and deceptive act towards a person; (3) directly and indirectly obtained property by fraud and misrepresentation; and (4) knowingly made published and disseminated false, deceptive and misleading information.

100.    On information and belief, the actions and underlying decisions of Defendants, alleged herein emanated from and occurred within the State of California. California law applies to the claims of Plaintiff and all Class members.  Defendants

planned and implemented their wrongful scheme in California and many of the wrongful acts emanated from Countrywide's California offices.

101.    Defendants' conduct described herein constitutes an unlawful business practice within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.* in that the conduct violates, among other laws, the Racketeering Influenced and Corrupt Practice Act ("RICO"), the Real Estate Settlement Procedures Act of 1974 ("RESPA"), California Civil Code section 1090.5, and the common law of fraud and unjust enrichment. Specifically, as alleged herein, Countrywide has:

- Violated 18 U.S.C. § 1962(c) by conducting the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interested commerce through a pattern of racketeering activity, and engaged in a conspiracy in violation of 18 U.S.C. § 1962(d);

- Violated 12 U.S.C.  § 2607(a)-(c), Regulation X, 24 C.F.R. § 3500.14, and 24 C.F.R. § 3500.2 by referring appraisal settlement services business to LandSafe (1) in exchange for control over the appraisal valuation process; and (2) without making the disclosures required by RESPA;

- Violated 12 U.S.C. § 2607(b) and Regulation X, 24 C.F.R. § 3500.14, by charging fees for appraisals that were never properly conducted;

- Violated Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") by influencing, coercing and manipulating the appraisal process;

- Violated the National Housing Act, as amended, by influencing, coercing and manipulating the appraisal process in connection with FHA-backed loans;

- Engaged in acts prohibited by California Civil Code section 1090.5, including: (1) "[s]eeking to influence a person who prepares a valuation to report a minimum or maximum value for the property being valued," Cal. Civ. Code § 1090.5(a)(1); (2) "[w]ithholding or threatening to withhold timely payment to a person or entity that prepares a valuation, or provides

valuation management functions, because that person or entity does not return a value at or above a certain amount," *id.* at § 1090.5(a)(2); (3) "[i]mplying to a person who prepares a valuation that current or future retention of that person depends on the amount at which the person estimates the value of the real property," *id.* at § 1090.5(a)(3); (4) "[e]xcluding a person who prepares a valuation from consideration for future engagement because the person reports a value that does not meet or exceed a predetermined threshold," *id.* at § 1090.5(a)(4); and

- Violated the common law governing unjust enrichment by receiving a benefit from Plaintiff and Class members in the form of appraisal fees, which fees were unearned and unreasonable, not for services actually performed and made in violation of federal and common law.

102.  Defendants' conduct as described herein violates not only the "unlawful" prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong. Defendants' conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.  Any justification for Defendants' practices is outweighed by the consequences and harm to Plaintiffs and the Class. There were reasonable alternatives available to Defendants to further Defendants' legitimate business interests, other than the conduct described herein.

103.  Plaintiff and members of the Class have suffered injury-in-fact and have lost money or property as a result of Defendants' unlawful, unfair and/or deceptive business practices.  Each of Defendants' omissions was material to Plaintiff and members of the Class in ordering and paying for the fraudulent, manipulated and inflated "appraisals" at issue.

104.  Plaintiff and the members of the Class seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

105.  Defendants' conduct was also "fraudulent, misleading, or likely to deceive

the public" within the meaning of California Business and Professions Code section 17200.

106.    Had the true nature of the fraudulent, manipulated and inflated appraisals been disclosed to Plaintiff and Class members, they would not have paid for the appraisals at issue.

107.    Plaintiff and members of the Class have been injured in fact and suffered a loss of money or property as a result of Defendants' fraudulent, unlawful, and unfair business practices.

108.    Defendants have thus engaged in unlawful, unfair, and fraudulent business acts entitling Plaintiff and members of the Class to judgment and equitable relief against Defendants, as set forth in the Prayer for Relief.

109.    Additionally, under Business and Professions Code section 17203, Plaintiff and members of the Class seek an order requiring Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices, and requiring Defendants to correct their actions.

## SECOND CLAIM FOR RELIEF
### Violations of the Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. § 1962(c))

110.     Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

111.    Plaintiff brings this cause of action on behalf of herself and the members of the Class.

### THE RICO ENTERPRISE

112.    Defendants Countrywide Financial, Countrywide Home Loans, FSL, Countrywide Bank, LandSafe and BofA are each persons within the meaning of Title 18 United States Code section 1961(3).

113.    At all relevant times, in violation of Title 18 United States Code section

1962(c), Defendants Countrywide Financial, Countrywide Home Loans, FSL, Countrywide Bank, LandSafe, and BofA, including their directors, employees, and agents, conducted the affairs of an association-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Countrywide Enterprise").  The affairs of the Countrywide Enterprise affected interstate commerce through a pattern of racketeering activity.

114.   The Countrywide Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of generating the fraudulent and phony appraisals of the real property at issue in this case.

115.   While the members of the Countrywide Enterprise participated in and are part of the enterprise, they also have an existence separate and distinct from the enterprise. The Countrywide Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Countrywide and the persons and/or entities procuring and preparing the fraudulent appraisals.

116.   Operating the Countrywide Enterprise according to policies and procedures developed and established by its executives, Countrywide controlled and directed the affairs of the Countrywide Enterprise and used the other members of the Countrywide Enterprise as instrumentalities to carry out the fraudulent scheme to fraudulently, systematically and uniformly produce and charge borrowers for phony "appraisals" of properties in connection with home loans originated by Countrywide.  These policies and procedures established by Countrywide and LandSafe's executives include refusing to utilize bona fide appraisers; paying above-market fees to those appraisers who disregarded the appraisal "independence" requirements and manipulated the market values of subject properties; rewarding appraisers who produced manipulated appraisals; blacklisting, retaliating against, and firing appraisers who refused to engage in such corrupt conduct; requiring appraisers to rely upon information outside the relevant market to justify manipulated valuations in appraisals; and providing appraisers with false sales

27

information and comparables to ensure the production of inflated appraisals.

**THE PREDICATE ACTS**

117.   The Countrywide Enterprise's scheme to fraudulently, systematically and uniformly produce and charge borrowers for phony, manipulated and inflated "appraisals" of properties in connection with home loans originated by Countrywide was facilitated by the use of the United States Mail and wire.  Indeed, the Defendants used the United States Mail (including the use of interstate carriers such as Federal Express) and the wires to submit representations concerning the manipulated appraisals, used the United States Mail and the wires to submit the so-called "appraisals" to Plaintiff and members of the class, and used the United States Mail and the wires to submit invoices for the so-called "appraisals."  The scheme constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

118.   In violation of Title 18 United States Code sections 1341 and 1343, the Countrywide Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers by obtaining money from them, in the form of payments for the so-called appraisals, using false or fraudulent pretenses.

119.   18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice …"

120.   The Countrywide Enterprise's collective association and collective action in procuring and preparing fraudulent appraisals constitutes the RICO enterprise.  Every member of the Countrywide Enterprise participated in the process of misrepresenting and concealing the fraudulent nature of the purported appraisals, and charging for the so-called appraisals, thereby allowing them to increase their revenues. The Countrywide

Enterprise earned millions of dollars in wrongful profits as a result.

121.   In perpetrating the fraudulent scheme, each member of the Countrywide Enterprise directly or indirectly through its corporate structure has designed and implemented a uniform scheme to prepare and charge for the fraudulent appraisals at issue here.  The Countrywide Enterprise's representations and concealments of their ordering, utilization and charging for so-called USPAP "appraisals," of property comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

122.   The Countrywide Enterprise has knowingly, intentionally or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343, by knowingly and intentionally implementing the scheme to misrepresent and conceal their statements about the preparation, use and charging for so-called USPAP "appraisals" of property that was securing their loans, which allowed the Countrywide Enterprise to reap unlawful profits.

123.   By devising the scheme or artifice to defraud consumers as described herein, the Countrywide Enterprise transmitted or caused to be transmitted by means of "wire communication in interstate or foreign commerce, ... writings, signs, signals, [and] pictures," "for the purpose of executing such scheme or artifice," including by: (i) transmitting phony USPAP "appraisals" of the property securing their loans and (ii) transmitting e-mail communications relating to the process of determining, making or transmitting the phony property appraisals.

124.   Plaintiff is informed and believes that, in addition to the conduct described above, the Countrywide Enterprise used the wires in conjunction with reaching their agreement to make false statements about their use and charging for "appraisals" of the properties at issue here.

125.   Through the racketeering scheme described above, Defendants used the enterprise to improperly increase their profits to the detriment of consumers in different

states.

126.   The Countrywide Enterprise organized and implemented the scheme, and ensured it continued uninterrupted by concealing their use and charging for inflated or otherwise manipulated "appraisals" from consumers, including Plaintiff.

127.   The Countrywide Enterprise knew the scheme would defraud borrowers, yet each member of the Countrywide Enterprise remained a participant despite the fraudulent nature of the enterprise. At any point while the scheme had been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence.  Rather than stopping the scheme, however, the members of the Countrywide Enterprise deliberately chose to continue it, to the direct detriment of consumers such as Plaintiff.  Plaintiff suffered injury resulting from the pattern of racketeering activity.

128.   Because Plaintiff unknowingly paid for a fraudulent appraisal, Plaintiff is a direct victim of the Countrywide Enterprise's wrongful and unlawful conduct.  Plaintiff's injuries were direct, proximate, foreseeable and natural consequences of Defendants' conduct.  There are no independent factors that account for Plaintiff's economic injuries, and the loss of money satisfies RICO's injury requirement.

129.   Plaintiff, and members of the Class, are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs or suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

130.   As a direct and proximate result of the subject racketeering activities, Plaintiff and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting the Countrywide Enterprise from further engaging in their unlawful conduct.

131.   Under the provisions of Section 1964(c) of RICO, members of the Countrywide Enterprise are jointly and severally liable to Plaintiff and Class members for three times the damages that Plaintiff and the Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees

### THIRD CLAIM FOR RELIEF
**Violation of the Racketeer Influenced and Corrupt Organizations Act, Conspiracy to Violate Title 18 United States Code section 1962(c) (18 U.S.C. § 1962(d))**

132.   Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

133.   Plaintiff brings this cause of action on behalf of herself and the members of the Class.

134.   As set forth above, in violation of Title 18 United States Code section 1962(d), members of the Countrywide Enterprise conspired to violate the provisions of Title 18 United States Code section 1962(c).

135.   As set forth above, Defendants, having directed and controlled the affairs of the Countrywide Enterprise, was aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

136.   As a direct and proximate result, Plaintiff and the members of the Class have been injured in their business or property by the predicate acts which make up the Countrywide Enterprise's pattern of racketeering activity in that they ordered and charged for manipulated "appraisals."

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**

137.   Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

138.   Plaintiff brings this cause of action on behalf of herself and the members of the Class.

139.   By their wrongful acts, Defendants were unjustly enriched at the expense of Plaintiff and members of the Class.

140.    Defendants knowingly, fraudulently, systematically, and uniformly procured

31

and prepared manipulated and/or inflated appraisals on home loans originated by Countrywide.

141.   Defendants then charged Plaintiff and members of the Class between $300 and $600 for phony, manipulated so-called USPAP appraisals, which solely benefitted Defendants.

142.   Thus, Plaintiff and members of the Class were unjustly deprived.

143.   It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

144.   Plaintiff and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct..

## FIFTH CLAIM FOR RELIEF
### Fraud

145.   Plaintiff incorporates by reference in this claim for relief each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

146.   Plaintiff brings this cause of action on behalf of herself and the members of the Class.

147.   Defendants misrepresented that they had prepared an "appraisal" of real property that was performed in accordance with strict USPAP's legal and ethical standards governing appraisals, and that Plaintiff was charged for a legally-mandated "appraisal" of real property prepared in accordance with strict USPAP's legal and ethical standards governing appraisals.

148.   Defendants concealed and suppressed material facts, namely, the fact that they had procured, prepared and charged for an appraisal that was not prepared in accordance with USPAP's legal and ethical standards but rather was inflated or otherwise manipulated.

149.   Plaintiff justifiably relied on the reasonable expectation that Defendants would act in compliance with the law, which included ordering and preparing legally-mandated USPAP appraisals of the real property they were purchasing or refinancing.

150.   Had the true nature of the Defendants' manipulation of the so-called USPAP "appraisals"  been disclosed to Plaintiff and members of the Class, they would not have paid for such appraisals.

151.   Defendants knew their concealment and suppression of materials facts was false, misleading, and were fully aware that Plaintiffs would pay for the phony USPAP appraisals.

152.   As a result of Defendants' fraudulent omissions and misrepresentations, Plaintiff and members of the Class have been injured in fact and suffered a loss of money or property.  Plaintiff and members of the Class would not have obtained and paid for phony USPAP appraisals in connection with their home loan transactions had it not been for Defendants' concealment of material facts.

153.   Plaintiffs and members of the Class justifiably relied upon Defendants' knowing, affirmative, and active concealment.  By concealing material information about their scheme to prepare phony USPAP appraisals, Defendants intended to induce Plaintiff and members of the Class into believing that the appraisals were legitimately prepared.

154.   As a direct and proximate result of Defendants' omissions and active concealment of material facts, Plaintiff and each member of the Class has been damaged in an amount according to proof at trial.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

1.   Certifying the Class, as requested herein, certifying Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as counsel for the Class;

2.   Ordering that Defendants are financially responsible for notifying all members of the Class of the alleged conduct discussed herein;

THIRD AMENDED CLASS ACTION COMPLAINT

3.      Awarding Plaintiff and the members of the Class compensatory damages in an amount according to proof at trial;

4.      Awarding restitution and disgorgement of Defendants' revenues and/or profits to Plaintiff and members of the Class;

5.      Awarding Plaintiff and the members of the Class treble damages in an amount according to proof at trial;

6.      Awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by Defendants by means of any act or practice declared by this Court to be wrongful;

7.      Awarding interest on the monies wrongfully obtained from the date of collection through the date of entry of judgment in this action;

8.      Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

9.      For such other and further relief as the Court deems just and proper.

Dated:  October 27, 2014                    BARON & BUDD, P.C.


By:  ___/s/ Roland Tellis_____
          Roland Tellis

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
Isaac Miller (SBN 266459)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California 91436
Telephone:  (818) 839-2333
Facsimile:   (818) 986-9698

Attorneys for Plaintiff
BARBARA WALDRUP, individually, and
on behalf of other members of the public
similarly situated

THIRD AMENDED CLASS ACTION COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial of her claims by jury to the extent authorized by law.

Dated:  October 27, 2014

BARON & BUDD, P.C.

By:   /s/ Roland Tellis
      Roland Tellis

Daniel Alberstone (SBN 105275)
Roland Tellis (SBN 186269)
Mark Pifko (SBN 228412)
Isaac Miller (SBN 266459)
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:   (818) 839-2333
Facsimile:    (818) 986-9698

Attorneys for Plaintiff
BARBARA WALDRUP, individually,
and on behalf of other members of the
public similarly situated