1  Daniel Alberstone (SBN 105275)
   dalberstone@baronbudd.com
2  Roland Tellis (SBN 186269)
   rtellis@baronbudd.com
3  Mark Pifko (SBN 228412)
   mpifko@baronbudd.com
4  Evan Zucker (SBN 266702)
   ezucker@baronbudd.com
5  Elizabeth Smiley (SBN 318165)
   esmiley@baronbudd.com
6  BARON & BUDD, P.C.
7  15910 Ventura Boulevard, Suite 1600
   Encino, California  91436
8  Telephone:  (818) 839-2333

   Steve W. Berman (*pro hac vice*)
   steve@hbsslaw.com
   Thomas E. Loeser (SBN 202724)
   toml@hbsslaw.com
   Hagens Berman Sobol Shapiro LLP
   1918 Eighth Avenue, Suite 3300
   Seattle, Washington  98101
   Telephone:  (206) 623-7292
   Facsimile:  (206) 623-0594

   Christopher R. Pitoun (SBN 290235)
   christopherp@hbsslaw.com
   Hagens Berman Sobol Shapiro LLP
   301 North Lake Avenue, Suite 920
   Pasadena, California  91101
   Telephone:  (213) 330-7150
   Facsimile:  (213) 330-7152

11 Attorneys for Plaintiffs
12 BARBARA WALDRUP, ELIZABETH
   WILLIAMS, BECKIE REASTER,
13 REBECCA MURPHY individually, and
   on behalf of the certified classes

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| BARBARA WALDRUP, individually, and on behalf of other members of the general public similarly situated,<br><br>              Plaintiff,<br><br>    vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, et al.,<br><br>              Defendants. | Case Number:  2:13-cv-08833-CAS(AGRx) CLASS ACTION<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>District Court Judge:  Christina A. Snyder<br>Magistrate Judge:  Alicia G. Rosenberg<br><br>Date:           November 18, 2019<br>Time:           10:00 a.m.<br>Location:       Dept. 8D<br>Action Filed:   November 27, 2013 |

1

2   ELIZABETH WILLIAMS, BECKIE
    REASTER, REBECCA MURPHY,
3   individually, and on behalf of all others
    similarly situated,
4
5              Plaintiffs,
         vs.
6
7   COUNTRYWIDE FINANCIAL
    CORPORATION, a Delaware
8   corporation, et al.
9              Defendants.

Trial Date:          January 14, 2020

Consolidated with
Case Number:  2:16-cv-4166 CAS(AGRx)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................... 1

II.   LEGAL STANDARD ................................................................................ 3

III.  COMMON EVIDENCE ESTABLISHES THAT EVERY APPRAISAL
      WAS NON-USPAP COMPLIANT ............................................................ 4

      A.   The Thirteen Policies Set By Countrywide and Implemented by
           LandSafe Constitute Proof of Defendants' USPAP Violations ..................... 4

      B.   LandSafe Manager Kyle Lagow Blows the Whistle on Defendants'
           Corrupt Appraisal Process ............................................................. 8

      C.   Indisputable Class-Wide Evidence Confirm Lagow's Account of
           Defendants' Misconduct ............................................................. 10

      D.   Plaintiffs' Expert J. Philip Cook Identifies Class-Wide Evidence that
           Corrupted the Entire Appraisal Process ......................................... 11

IV.   PLAINTIFFS CLASS-WIDE EVIDENCE ALSO PROVES EACH
      CHALLENGED RICO ELEMENT .......................................................... 15

      A.   Plaintiffs *Can* Prove a Cognizable RICO Enterprise ...................... 15

      B.   Plaintiffs *Can* Prove that the Alleged Misrepresentation Was Both
           Material and Caused Each Class Member's Injury ......................... 18

      C.   The Holding Company Defendants Engaged in the Enterprise's
           Conduct ............................................................................... 20

      D.   Plaintiffs' RICO Claim Is Properly Based on Defendants' Mail and
           Wire Fraud ........................................................................... 21

V.    UNJUST ENRICHMENT IS A PROPER CAUSE OF ACTION UNDER
      TEXAS LAW ........................................................................................ 22

VI.   PLAINTIFFS' CLAIMS ARE TIMELY .................................................. 22

VII.  GENUINE ISSUES OF FACT REMAIN AS TO WALDRUP'S
      INDIVIDUAL CLAIMS .......................................................................... 24

VIII. CONCLUSION...................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 5-Hour Energy Mktg. & Sales Practices Litig.*,
 2017 WL 2559615 (C.D. Cal. June 7, 2017) .................................................. 18

*In re Actimmune Mktg. Litig.*,
 614 F.Supp.2d 1037 (N.D. Cal. 2009) ......................................................... 19

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ...................................................................................... 3

*Astiana v. Hain Celestial Grp., Inc.*,
 783 F.3d 753 (9th Cir. 2015) ...................................................................... 25

*BMG Direct Mktg. v. Peake*,
 178 S.W.3d 763 (Tex. 2005) ....................................................................... 22

*Bridge v. Phoenix Bond & Indem. Co.*,
 553 U.S. 639 (2008)..................................................................................... 19

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP*
 (7th Cir. 2003) 329 F.3d 923 ...................................................................... 17

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)....................................................................................... 3

*In re Countrywide Fin. Corp. Mortg. Mktg and Sales Practices Litig.*
 601 F.Supp.2d 1201 (S.D. Cal. 2009)......................................................... 15

*Engalla v. Permanente Medical Group, Inc.*,
 15 Cal. 4th 951 (1997) ................................................................................ 24

*Farar v. Bayer AG*,
 2017 WL 5952876 (N.D. Cal. Nov. 15, 2017) ...................................... 3, 15

*First Nat. Bank of Ariz. v. Cities Service Co.*
 391 U.S. 253 (1986)..................................................................................... 10

*Freeman v. Harleton Oil & Gas, Inc.*,
 528 S.W.3d 708 (Tex. App.-Texarkana 2017) ........................................... 22

*Garcia v. Brockway*,
    526 F.3d 456 (9th Cir. 2008) ...................................................................... 22

*Grimmett v. Brown*,
    75 F.3d 506 (9th Cir.1996) ........................................................................ 22

*Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*,
    747 F.2d 384 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985)............................ 17

*Heldenfels Bros., Inc. v. City of Corpus Christi*,
    832 S.W.2d 39 (Tex. 1992).......................................................................... 22

*United States of America ex rel. Kyle Lagow v. Countrywide Financial Corporation, et al.*,
    Case No. 1:09-cv-02040-RJD-JMA (E.D.N.Y. May 13, 2009) ......................... 8, 10, 23

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ...................................................................... 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................... 3

*Mirkin v. Wasserman*,
    5 Cal. 4th 1082 (1993) ................................................................................ 24

*Moran v. Bromma*
    675 F. App'x 641 (9th Cir. 2017) ................................................................ 16

*Pincay v. Andrews*,
    238 F.3d 1106 (9th Cir. 2001) .................................................................... 22

*Sonner v. Schwabe North America, Inc.*,
    911 F.3d 989 (9th Cir. 2018) ................................................................... 4, 15

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*
    809 F.2d 626 (9th Cir. 1987) ....................................................................... 3

*Woolsey v. J.P. Morgan Ventures Energy Corp.*,
    No. 15CV530-WQH-BGS, 2015 WL 6455571 (S.D. Cal. Oct. 26, 2015) ................. 21

**Other Authorities**

12 C.F.R. § 47 ............................................................................................... 21

# I. INTRODUCTION

Defendants correctly assert that Plaintiffs' claims are based on Defendants' companywide practices and policies, which caused ***every*** appraisal at-issue to be worthless.  But virtually nothing else they say in their motion bears any truth.  To be sure, Defendants continue to feign a fundamental misunderstanding of Plaintiffs' case, insisting that Plaintiffs' claims rise or fall on their ability to prove the corrupt intent of each and every appraiser.  But Defendants are painfully aware that Plaintiffs' case does not implicate the state of mind of ***any*** individual appraiser.  In fact, this Court previously found "plaintiffs emphasize that their theory of liability does not depend on whether any particular appraisal was overvalued."  Plaintiffs' Separate Statement of Disputed Facts ("SDF") 48.  And, earlier this year the Court cautioned Defendants that "[t]he individual thought process of the appraisers I don't think has the significance that you argue for." SDF 49.  But Defendants have remained undeterred, hoping to reshape the narrative.

Defendants suggest that Plaintiffs have not identified any class-wide policies that "applied to all of the appraisers and all of the appraisals they conducted."  The undisputed evidence proves otherwise.  As shown below, each of the thirteen policies Plaintiffs have identified at the Court's request corrupted the appraisal process, and thereby impacted and/or applied to each of the appraisals Defendants misrepresented as compliant with the Uniform Standards of Professional Appraisal Practice ("USPAP").

Defendants also argue there is no class-wide evidence that these policies in fact compromised the independence of every appraiser.  Defendants conveniently ignore that LandSafe was an appraisal management company ("AMC") and, as such, was subject to the same overarching ethical guidelines contained in USPAP as individual appraisers.[1]  In particular, LandSafe was required by USPAP to perform assignments with "impartiality, objectivity, and independence, without accommodation of personal interests."  It

---

[1] USPAP provides:  "This Rule specifies the personal obligations and responsibilities of the individual appraiser.  However, it should also be noted that groups and organizations engaged in appraisal practice share in the same ethical obligations."  SDF 50.

indisputably failed to do so here.  Landsafe was also required by USPAP to refrain from accepting any assignment that included a request by its client (Countrywide or Bank of America) to reach a "predetermined result."  But this is exactly what happened here, and demonstrably so.

Defendants also attempt to distinguish between staff appraisers, on the one hand, and outside fee appraisers, on the other, in an effort to remove from the class those borrowers whose appraisals were performed by outside fee appraisers.[2]  But Defendants know that it makes ___**no difference**___ whether the appraisal was performed by a staff or fee appraiser because ___**all**___ appraisals were subject to the same LandSafe policies and procedures, and ___**all**___ appraisals were reviewed and "warranted" by LandSafe before they were delivered to Countrywide.  In LandSafe's own words, "___**The final appraisal delivered represents a valuation 'warranted' by LandSafe Appraisal, not the individual fee panel or field staff appraiser**___."

Finally, Defendants challenge Plaintiffs' claim that the non-USPAP compliant appraisals were "worthless" to every borrower because, according to Defendants, borrowers agreed to pay the appraisal fee as a condition of obtaining the loans they wanted, not because they wanted appraisals or cared about getting appraisals that complied with USPAP.  Not only does the argument defy logic and common sense, here, But Defendants attempted sleight of hand fails.  They ignore the fact that a USPAP compliant appraisal was, in fact, required to close ___**every**___ class member's loan transaction.  In other words, Defendants ___**could**___ ___**not**___ have closed ___**any**___ loan without falsely claiming the appraisals supporting those loans were USPAP compliant. Thus, although

---

[2]  Defendants lean heavily on statistics provided by their purported "expert," Mark J. Garmaise, in an effort to establish the percentages of those appraisals performed by staff appraisers.  But as shown below, Garmaise's report and opinions are neither credible nor reliable, and most importantly not admissible, as Garmaise blindly relied on his employer to interpret the data upon which he based his statistical opinions without any knowledge, or even curiosity on his part, concerning the source, credibility or reliability of the information that was provided to him.

borrowers paid for their appraisals in connection with their loan applications, ***those loans closed because of Defendants' lies***.  Garmaise admitted as much under oath.  SDF 51.

For the reasons set forth above, and those addressed below, Plaintiffs respectfully request the Court to deny Defendants' motion in its entirety.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); see also Fed.R.Civ.P. 56(c), (e).  When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  "If direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  Put another way, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied."  *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n* 809 F.2d 626, 631 (9th Cir. 1987) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 613 *also citing First Nat. Bank of Ariz. v. Cities Service Co.* 391 U.S. 253, 287-88 (1986).)

Importantly here, when competing expert testimony is provided by the parties, "such conflicting evidence would merely create a genuine issue of material fact inappropriate for summary adjudication."  *Farar v. Bayer AG*, 2017 WL 5952876, at *17-

18 (N.D. Cal. Nov. 15, 2017) *quoted* in *Sonner v. Schwabe North America, Inc.*, 911 F.3d 989, 991 (9th Cir. 2018).

## III. COMMON EVIDENCE ESTABLISHES THAT EVERY APPRAISAL WAS NON-USPAP COMPLIANT

### A. The Thirteen Policies Set By Countrywide and Implemented by LandSafe Constitute Proof of Defendants' USPAP Violations

Defendants argue that the thirteen policies Plaintiffs identified to the Court on October 31, 2018 (Dkt. No. 316), do not violate USPAP and that these policies are not "uniform." But, as detailed below, Defendants are flatly wrong. Each policy undisputedly impacted all class members uniformly. Further, each policy, individually—or in conjunction form the basis for Plaintiffs' claims that Defendants violated USPAP in their appraisal practice during the class period.

**Policy No. 1:** This policy, which is evidenced by W-2 forms, establishes that <u>all</u> LandSafe personnel were actually employed and compensated by Countrywide. SDF 52. Critically, review appraisers, who had the ability to unilaterally alter appraisal values, were actually employed by and paid by the lender. *Id.* Plaintiffs' appraisal expert, J. Philip Cook opines that this policy caused the necessary independence to be absent. SDF 53. ***This uniform policy impacted all class members***, a fact Defendants do not dispute.

**Policy No. 2:** This policy establishes that all LandSafe personnel, including managers and review appraisers, were required to acknowledge all appraisal and employment policies were dictated by Countrywide, including the terms and conditions of their employment. SDF 54. Thus, it is a fact that LandSafe review appraisers were explicitly operating at the direction and under the control of the "client" lender, Countrywide. In fact, their hiring was contingent upon their "acceptance of all policies and guidelines of LandSafe. SDF 54-56. So when LandSafe's President instructed his appraisal managers that "LandSafe appraisers were there to help facilitate a closing" he is stating company policy (set by Countrywide) to be propagated through all LandSafe managers and policy setters. SDF 57. ***This uniform policy impacted all class members***,

a fact Defendants do not dispute.

**Policy No. 3:** This policy establishes that LandSafe's appraisal policy was set by the "client" lender, Countrywide.  SDF 58.  With the lender setting appraisal policy applicable to the appraisal management company, Defendants cannot credibly claim there was any effective buffer or wall between the lender and the review appraiser.  ***This uniform policy impacted all class members***, a fact Defendants do not dispute.

**Policy No. 4:** Countrywide's review appraiser Incentive Plan was by its terms intended to "reward" *review* appraisers, who are at the heart of Plaintiffs' claims.  SDF 59.  Critically, both LandSafe and Countrywide employees testified that *all* appraisals were reviewed.  SDF 7, 8.  The Countrywide Incentive Plan provided that LandSafe review appraisers received bonuses for "support[ing] the increasing growth and profitability" of Defendants' enterprise.  SDF 61.  Whistleblower Kyle Lagow testified that Defendants used the review process to corrupt appraisals.  SDF 61.  Additionally, turn-times, which directly impact an appraisers' tier score (Policy No. 7) is included in the calculation of the bonus paid to reviewers and constitute a direct financial incentive from the lender to the reviewer in connection with every appraisals.  SDF 62. ***This uniform policy applied to all class members,*** a fact Defendants do not dispute.

**Policy Nos. 5 and 10:** LandSafe's Modification/Value Increase Policies authorized review appraisers, under the direction and control of the lender (see Policies 1 and 2), to increase the opinion of value reached by the original appraiser, thereby vitiating the original appraiser's USPAP certification.  SDF 63.  Moreover, LandSafe's President suggested that the appraiser value opinions should be increased if the appraiser "missed the [target] value" in order to close the loan, which is prohibited under USPAP.  SDF 64.  ***This policy applied to every Countywide loan that passed through LandSafe.***

**Policy No. 6:**  The Missed Purchase Price Policy is a review performed by computerized check on <u>every</u> appraisal report, no matter which lending division originated the loan.  SDF 65.  Defendants' assertion that this policy only applied to CMD

Case No.:  2:13-cv-08833-CAS(AGRx)

(one of their lending divisions) and only for a limited amount of time is belied by the facts.  SDF 66.  Patrick Ames, LandSafe's President confirmed that the policy was in place during the class period.  SDF 67.  ***This uniform policy impacted all class members***, a fact Defendants do not dispute.

**Policy No. 7:** LandSafe's Appraiser Tier Score Policy provided that all appraisers were assigned a tier score which impacted their ability to get future appraisal assignments. SDF 68.  If an appraiser's turn-time was low, they were financially penalized by getting less assignments.  *Id.*  Under the Missed Purchase Price Policy, for example, any appraisal that is not equal to or greater than the sale price must be sent by the appraiser for review prior to uploading the file onto LandSafe's computer system.  See Policy No. 6; SDF 69. This delay impacted turn time, which lowered their tier score and threatened their ability to get assignments.  SDF 68, 69.  ***This uniform policy applied to all class members***, a fact Defendants do not dispute.

**Policy No. 8:** Pursuant to Defendants' Appraiser Selection Policy, branch personnel had the ability to hand select which appraiser to assign to which file.  SDF 70.   Lagow testified that this policy applied companywide "regardless of where the loan originated or the type of loan", and that "the only justification for allowing a branch to pick their… appraisers is to have control over the values."  SDF 71.  Sidney Miller, LandSafe's Appraisal Compliance Officer, wrote an email when he learned of the policy questioning the appropriateness of the policy, querying "do we not understand the federal rules?" SDF 72.  In that email he lamented, "no wonder we have issues with the issue of pressure on appraisers and understanding of the [appraisal independence] guidelines."  SDF 73. Nevertheless, this policy was not changed ***until the day after the class period ended***, January 1, 2009.  SDF 74.  ***Moreover, this uniform policy applied to all class members***, a fact Defendants do not dispute.

**Policy No. 9:** Countrywide set an Appraisal Warranty Policy at Landsafe, which provides that the final appraisal delivered to Countrywide represents a valuation

Case No.:  2:13-cv-08833-CAS(AGRx)

"warranted" by LandSafe, not the individual appraiser, and that, as such, LandSafe may render a valuation that is different from any value provided by the original appraiser, including a higher value than presented by the original appraiser. SDF 75. In other words, this policy had taken the "final" valuation relied on by Countrywide out of the hands of the field appraiser and placed it into the hands of LandSafe, which had the final say as to the value being presented to Countrywide regardless of the valuation reached by the original appraiser. SDF 75, 76.

As a result of this policy, LandSafe took over the responsibility of certifying USPAP compliance. The state of mind of each individual appraiser concerning their compliance with USPAP became irrelevant. SDF 75, 76. Patrick Ames, LandSafe's President, when asked about this policy confirmed LandSafe's responsibility ("LandSafe being the provider of the valuation product to the client would make us the responsible party, and I think that's what the 'warranted' in quotes references, and we have taken responsibility for delivering a quality appraisal product.") SDF 77. ***This uniform policy applied to every class member***, a fact Defendants do not dispute.

**Policy No. 11:** Landsafe maintained a policy and procedure to unduly influence appraisers to hit predetermined values for sales and refinance transactions, referring internally to these predetermined values as "target" values or "requested" values. David Mentesana, Executive Vice President at LandSafe in charge of governance, said it this way: "The main way to satisfy this customer [Countrywide] is to make their deals work by hitting the target value." SDF 78. As mentioned above, Lagow testified that every appraisal assignment was accepted by LandSafe with an "expected value." SDF 6. Javier Jaraba, a Countrywide employee in charge of investigating appraisal independence issues testified that he believed "there's nothing wrong with [a Countrywide employee] trying to hit a target value to close a loan." SDF 79. The act of accepting an appraisal assignment with a target value is in itself a USPAP violation. SDF 80. In fact, Defendants' own sanitized Policy and Procedure documents recognize this conduct as a USPAP violation.

SDF 81. ***This uniform policy impacted all class members***, a fact Defendants do not dispute.

**Policy No. 12:** This policy addressed LandSafe's appraiser independence hotline. David Mentesana, LandSafe's EVP of Governance, admitted that the hotline was <u>not</u> meant to address independence violations *within* the company. SDF82. Todd Baur noted that "[Appraisal Independence] info is tracked and reported mainly for the regulators." SDF 83. The ineffectiveness of this toothless policy is evidenced by the testimony of Patricia Godfrey, a Countrywide employee tasked with taking action in response to appraiser independence complaints. Godfrey testified that she was given *no authority* to cancel an appraisal, order a second appraisal or otherwise hold up the closing of a loan in anyway, even if she identified a confirmed USPAP violation. SDF 84.

**Policy No. 13:** All appraisers, both staff appraisers and fee panel appraisers, were obligated to comply with all LandSafe policies and procedures. SDF 85. Fee panel appraisers were required to apply for the position, and were only approved based on their "acceptance of all policies, procedures and guidelines of LandSafe Appraisal Services, Inc." SDF 56. Mentesana testified that LandSafe employed a "Blast Fax Protocol" to provide policy and procedure documents to appraisers. SDF 86. This protocol was sent to both staff and fee appraisers. *Id.* Baur, LandSafe's President testified that all appraisers were required to follow LandSafe policies and procedures. SDF 85.

Thus any argument that LandSafe's policies and procedures only applied to staff appraisers is refuted by the evidence.

**B.  LandSafe Manager Kyle Lagow Blows the Whistle on Defendants' Corrupt Appraisal Process.**

Kyle Lagow, a former Countrywide appraisal manager, filed a *qui tam* complaint against Countrywide, LandSafe and Bank of America, as well as others, for violations of the False Claims Act in the United States District Court for the Eastern District of New York. *United States of America ex rel. Kyle Lagow v. Countrywide Financial Corporation, et al.*, Case No. 1:09-cv-02040-RJD-JMA (E.D.N.Y. May 13, 2009) at Dkt.

9) (the "Lagow Complaint"). Defendants are painfully aware that Lagow's complaint was unsealed in 2012 and resulted in a settlement requiring Bank of America to pay nearly a billion dollars to the government as a penalty for the very same appraisal scheme at issue here.  SDF 87.  However, borrowers injured by Defendants' conduct (class members here) never received a dime from Defendants.

Lagow testified at deposition in this case on March 16, 2016.  In his sworn testimony, Lagow confirmed that the appraisal corruption perpetrated by Defendants ***occurred companywide and across all loan products***.  SDF 88.  In particular, Lagow testified:

- Defendants rewarded appraisers who produced appraisals and appraisal reviews at a rate far in excess of what is possible if they were performed in compliance with USPAP.  SDF 89.

- Defendants used fraudulent appraisal reviews to support non-compliant appraisals and corrupted what would otherwise be appropriate appraisals. SDF 90.

-  LandSafe's policies and procedures applied to "every loan that we did, every appraisal that we did…"  SDF 91.

- Because of the corrupt relationship between Countrywide (the lender) and LandSafe (the appraisal management company), Defendants were able to enforce and implement their scheme for all loans originated by Countrywide during the time period.  SDF 92.

- Due to this corrupt relationship, Countrywide branch personnel who were originating loans, and who maintained a direct financial interest in the loan transaction, could pressure an appraiser, in part by selecting the appraiser directly "regardless of where the loan originated or the type of loan."  SDF 93.

- At a meeting with appraisal managers, LandSafe's President, Todd Baur, said

that "one, they needed to quit thinking of an appraisal as a separate unit; two, that LandSafe appraisers were there to help facilitate a closing; and three, that they needed to change their thought process, the clear implication being that they need to stop thinking like appraisers and think instead like lenders trying to close a loan." SDF 94. Lagow confirmed that Baur "conveyed this sentiment as a… company-wide practice that did not focus on a particular type of loan." *Id.*

- Due to the fraudulent appraisal scheme implemented by Defendants, the appraisals produced were not USPAP complaint. SDF 95. Defendants' corrupt practices impacted every appraisal, companywide, and flaunted USPAP standards.

Another former employee turned *qui tam* whistleblower, Robert Madsen, testified that "appraisals are not completed independently of [Countrywide and LandSafe's] financial interest in the determination of property values." SDF 96. Evelyn Grevelle, Vice President of Appraisal Quality at LandSafe summed it up when she said, "if you don't have independence, you don't have an appraisal." SDF 97.

### C. Indisputable Class-Wide Evidence Confirm Lagow's Account of Defendants' Misconduct

Defendants erroneously argue that "'class-wide evidence' establishing 'uniform violations of USPAP's independence requirement… never materialized" and that "Plaintiffs have not identified any class-wide policies that applied to all of the appraisers and all of the appraisals they conducted." Def. MSJ p. 1:13-16. In fact, documents produced by Defendants, and testimony given by current and former employees, confirm Lagow's account of Defendants' misconduct, and further evidence the uniform, class-wide policies in place designed to effectuate Defendants' scheme.

First, Plaintiffs have identified at least thirteen policies that individually and in the aggregate demonstrate USPAP violations. Dkt. 316.

Second, Mark Mellard, LandSafe's regional chief appraiser and later Vice President

Case No.: 2:13-cv-08833-CAS(AGRx)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

of Risk Management, testified that an appraisal can be non-USPAP compliant if there is an appraisal independence violation *irrespective of whether the value conclusion is reasonable*.  SDF 98.

Third, Trevor Philips, Defendants' appraisal expert, confirmed that an appraisal can be non-USPAP complaint, but still reach an appropriate value.  SDF 98.  Phillips further testified that *systemic issues present "in the appraisal ordering* **process"** can *render an appraisal non-compliant without that being apparent from looking at the appraisal report.*  SDF 99.

Fourth, Tracy Sanderson, LandSafe's National Review Manager, testified that if there is an independence violation with the appraisal process, the appraisal is "tainted." SDF 100.

At bottom, Plaintiffs' response to Defendants' Separate Statement of Uncontroverted Facts establishes that there are many disputed factual questions about whether or not these policies, individually or taken as a whole, violate USPAP.

### D.   Plaintiffs' Expert J. Philip Cook Identifies Class-Wide Evidence that Corrupted the Entire Appraisal Process

Plaintiffs' USPAP expert J. Philip Cook unequivocally opined that the ethical obligations of USPAP apply not only to individual appraisers, but to appraisal management companies as well:

> It is commonly understood in the valuation industry that appraisers are obligated to comply with USPAP, and specifically, with its Rules and Standards.  Not as apparent, however, is that groups and organizations involved in appraisal practice also have compliance obligations under USPAP.  SDF 50.

This is true for appraisal management companies even when they do not take over explicit appraisal valuation functions and warrant final appraisal values as LandSafe did here.  SDF 50, 75.

Moreover, Cook has identified class-wide evidence of Defendants' corrupt appraisal process:

Case No.:  2:13-cv-08833-CAS(AGRx)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(1) Appraisers received their paycheck and any bonuses directly from the lender. SDF 101;

(2) Appraisers were told that the appraisal management company, LandSafe, "report[ed]" to the lender, Countrywide. SDF 102;

(3) Appraisers were told that "LandSafe does not set Appraisal Policy for Countrywide, but rather the reverse is true." SDF 103; and

(4)  Appraisers and review appraisers were told that if an appraisal fails to "find appropriate support" for the sales price, there will be negative consequences.  SDF 104.

Cook opines that "the Defendants through their policies, practices and procedures, systematically and uniformly failed to meet basic ethical rules of independence and impartiality in connection with the preparation and review of appraisals."  SDF 105.  He also opines that "the Appraisals produced by Defendants did not meet the Uniform Standards of Professional Appraisal Practice ("USPAP"), as Defendants represented…" SDF 106.

Cook notes that an AMC, like LandSafe, is a market participant, and because LandSafe's profitability was highly dependent on Countrywide's business due to the high percentage of business derived from that one source, it was especially important for there to be a buffer between the AMC and the lender.  SDF 107.  However, LandSafe was a wholly owned subsidiary of Countrywide and its policies and procedures were created and approved by Countrywide.  SDF 58.  Moreover, any "buffer" Defendants may claim between their respective operations is destroyed by the fact that LandSafe not only receives its policies and procedures from Countrywide, it also reports to Countrywide too. SDF 58, 108.

Under USPAP standards, it is unethical and improper if an appraisal assignment is accepted by an appraiser or an AMC that affects their ability to perform impartially.  SDF 17.  USPAP identifies certain conditions that are non-complaint in any assignment.  SDF 109.  It is also non-complaint with USPAP for an AMC "to threaten employment or

otherwise pressure an appraiser—either in-house or contracted—to provide predetermined or purposely favorable results." SDF 110. This is not dependent on whether an outcome hits a predetermined result, the mere act represents the violation. Defendants engaged in both of these activities.

Appraisal reviews are a term of art in USPAP. A "review" is defined as "the act or process of developing and communicating an opinion about the quality of another appraiser's work." SDF 111. Cook opines that USPAP regulates the actions of a *review* appraiser, as well as the original appraiser. SDF 112. In fact, review appraisers are subject to the same ethical, independence and competency guidelines as the original appraiser, and so must not be financially incentivized with respect to their assignment, specifically they must "have no direct, indirect or prospective interest, financial or otherwise, in the property *or transaction*." SDF 114 (emphasis added). In connection with the appraisal review process, "[w]hether the value estimate is too high or too low to accommodate the needs of the [lender] is immaterial to the review" under the USPAP guidelines. SDF 115. Defendants corrupted the review process by disregarding these USPAP requirements. SDF 116.

To put a finer point on this fact, Cook opines that "Defendants engaged in a pattern of undue influence and control over the appraisal process that breached the firewall of appraiser independence and led to non-USPAP compliant appraisals." SDF 117. Cook notes that even Defendants' written policies and procedures that appear to be intended to present a facially valid picture of their appraisal process, betray their scheme. Defendants' appraisal policy provides that the appraisal selection process should "be safeguarded from internal influence and interference from any loan production staff… Countrywide Bank will not accept an appraisal prepared by an individual who was selected or engaged by a borrower, or by loan production personnel." SDF 118. Notably, Policy No. 8 (Appraiser Selection Policy) evidences that this policy was ignored in practice, and contradicted by other applicable policies.

Cook also opines that by employing review appraisers who were participants in Countrywide's Bonus Incentive Plan, Defendants violated the USPAP rule against appraisers having a financial interest in the transactions.  SDF 119 (*See* Policy Nos. 1 and 4).

Cook notes that due to the relationship between Countrywide and LandSafe "it is inappropriate for Countrywide to maintain an [unapproved vendor list] for appraisers…" SDF 120.  Cook then recounts that Sidney Miller, in charge of compliance implied that Countrywide's imposition of an "unacceptable vendor list" upon LandSafe was non-USPAP complaint:

> Q. Based on the position you held at LandSafe, did you determine at any time that Countrywide's unacceptable vendor list was inappropriate and in violation of USPAP or other regulations?
>
> A. I may have discussed this with our attorney on occasion.

SDF 121.

Cook also identifies other USPAP violations in the automated appraisal review system implemented by Defendants.  Cook cites to an email from Sidney Miller: "I had no idea that we apparently triggered the audit rules to flag that fact that the value arrived at by the appraiser was checked against the 'owner's estimate' and flagged if it did not reach it.  *That is a concern to me*."  SDF 122 (emphasis added).

Frank Towery responded to Miller that the audit rule had been in place for years and noted he was not able to change it.  SDF 123.  In response, ***Miller acknowledged that the "audit rule" was inconsistent with internal policy and with USPAP***.  SDF 122, 123 (emphasis added).

Cook ultimately opines that "there is strong evidence that Countrywide's undue influence and control in the appraisal process was exerted on a systemic, nationwide basis during the class period.  Appraisals are not properly judged for reliability based on value. ***The reliability of appraisals is based on adherence to fundamental appraisal principles***

*and established appraisal practice which the Defendants violated.*"  SDF 124 (emphasis added).

The opinions proffered by Cook alone raise triable issues of fact that require denial of Defendants' motion.  *See Farar v. Bayer AG*, 2017 WL 5952876, at *17-18 (N.D. Cal. Nov. 15, 2017) *quoted* in *Sonner v. Schwabe North America, Inc.*, 911 F.3d 989, 991 (9th Cir. 2018) (When competing expert testimony is provided by the parties, "such conflicting evidence would merely create a genuine issue of material fact inappropriate for summary adjudication").

## IV.  PLAINTIFFS CLASS-WIDE EVIDENCE ALSO PROVES EACH CHALLENGED RICO ELEMENT

### A.  Plaintiffs *Can* Prove a Cognizable RICO Enterprise

Defendants recycle an argument they unsuccessfully raised at the pleading stage – that "Plaintiffs' affiliate-only enterprise is not a cognizable enterprise that is distinct from the corporate person."  Def. MSJ, at p. 17:12-14.  But here again, Defendants are wrong.

As this Court previously found in its ruling on Defendants' Motion to Dismiss, "the formal, legal separation of the defendant entities satisfies the RICO distinctiveness requirement."  Dkt. No. 52 at 10 (citing *Negrete v. Allianz Life Ins. Co. of N. Am.*, 926 F.Supp.2d 1143, 1151 (C.D. Cal. 2013) (discussing conflicting authority and finding that the "formal separation [of parent and subsidiary companies] is alone sufficient to support a finding of distinctiveness")).  And this Court is not alone.  In *In re Countrywide Fin. Corp. Mortg. Mktg and Sales Practices Litig.,* 601 F.Supp.2d 1201, 1214 (S.D. Cal. 2009) the Southern District of California ruled that Countrywide and LandSafe are sufficiently distinct for purposes of RICO, holding that they meet even the out of circuit "something more" standard.  *Id.* at 1214-15.  As Defendants admit, each corporate defendant is or was a formally separated legal entity. *See* Def. SUF 1-5.  Under these facts, and as the Court held previously, the "distinctiveness" requirement has been clearly met under Ninth Circuit precedent.  Dkt. No. 52 at 10 fn. 4 (citing *In re Countrywide Fin. Corp. Mortg. Mktg and Sales Practices Litig.,* 601 F.Supp.2d 1201, 1214 (S.D. Cal. 2009)).

1    Moreover, Defendants' reliance on the Ninth Circuit's unpublished opinion in

2  *Moran v. Bromma* 675 F. App'x 641, 645 (9th Cir. 2017) offers them no assistance.  Def.

3  MSJ, at p. 17:18-21.  Although *Moran* was decided after this Court's motion to dismiss

4  ruling, *Moran* relies entirely on a 2005 Ninth Circuit case called *Living Designs, Inc. v.*

5  *E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).  And nothing in *Moran*

6  changes the "distinctiveness" analysis as applied by this Court when it last evaluated this

7  issue.  In that regard, the *Moran* court ***did not***, as the Defendants assert here, create a new

8  rule requiring that a RICO claim fails as a matter of law anytime the RICO persons are

9  members of the same corporate family.  Def. MSJ, at p. 17:18-21.  Defendants blatantly

10  and materially misstate the *Moran* Court's holding in an effort to mislead the Court.

11    In *Moran*, the Ninth Circuit found that whether a RICO enterprise can exist

12  between corporations is factually dependent on the circumstances.  *Id.* at 645.  Moreover,

13  *on the issue of whether the same members of a corporate family can form a RICO*

14  *enterprise, the court only suggested it depended on the facts of each case*, saying:

15  "[Plaintiff] makes no cognizable arguments explaining how [Defendants] are separate and

16  distinct from the alleged enterprise, consisting only of members of the same corporate

17  family. We will not manufacture arguments for an appellant, and a bare assertion does not

18  preserve a claim, particularly when, as here, a host of other issues are presented for

19  review."  *Id.* at 645-46 (citation omitted).

20    In essence, the *Moran* court found that the plaintiff had failed to assert facts

21  demonstrating the separateness and distinctiveness of defendants from the enterprise

22  being alleged.  Of course, Plaintiffs here have met their burden.  Furthermore,

23  Defendants' assertion that the *Moran* court held a RICO claim fails as a matter of law

24  where the supposed RICO persons and enterprise consist only of members of the same

25  corporate family, is demonstrably false.

26    Defendants also rely on a laundry list of "non-binding precedent holdings" earlier

27  raised at the pleading stage "that parent and subsidiary corporations lack sufficient

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

distinctiveness to constitute a RICO enterprise." *See* Dkt. No. 52 at 9.  Ruling on

Defendants' motion to dismiss, this Court refused to adopt these out-of-circuit standards,

and there has been no change in Ninth Circuit law that would compel this Court to deviate

from its prior ruling.

Defendants' reliance on *Copperweld Corp. v. Indep. Tube Corp.* fares no better.  In

that case, the Supreme Court's holding that a parent and a subsidiary could not conspire

with each other was exclusively within the context of the Sherman Antitrust Act, and did

not extend to RICO.  *Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 747 F.2d 384,

403 (7th Cir. 1984), *aff'd,* 473 U.S. 606 (1985) (citing *Copperweld Corp. v. Independence

Tube Corp.*, 467 U.S. 752, 768-72 (1984).

Moreover, factually, the "family of companies" argument here fails because

Defendants purported to act distinctly.  And even assuming the "something more"

standard from other circuits was applicable here, it is satisfied.  Under the "something

more" standard in the Seventh Circuit, a parent and subsidiary are not sufficiently distinct

to trigger RICO liability "unless the enterprise's decision to operate through subsidiaries

rather than divisions somehow facilities its unlawful activity."  *Bucklew v. Hawkins, Ash,

Baptie & Co., LLP* (7th Cir. 2003) 329 F.3d 923, 934.  *Bucklew* then says RICO claims

could successfully be applied to a parent and subsidiary if the subsidiary "lend[s] an air of

legitimacy to a person or entity that unless masked by a legitimate-seeming enterprise

would be quickly discovered to be engaged in criminal acts."  *Id.*

Here, Patrick Ames testified that LandSafe has a "responsibility [as the] AMC – to

provide a level of buffer between the appraiser and the lender."  SDF 107, 125.  David

Mentesana testified that "the relationship between LandSafe and Countrywide was -- was

well known and … there was an association there … but LandSafe was still a stand-alone

company that provided independent products."  SDF 126.  Todd Baur, President and COO

of LandSafe, testified that he saw Countrywide and Landsafe "as two separate

companies."  SDF 127.

Defendants cannot have it both ways.  In particular, Defendants cannot successfully argue, on the one hand, that LandSafe's distinctiveness provides the separation necessary to insulate Defendants' from USPAP appraiser independence violations, while at the same time arguing that belonging in the same family of companies immunizes them from RICO liability.

**B.     Plaintiffs *Can* Prove that the Alleged Misrepresentation Was Both Material and Caused Each Class Member's Injury**

Defendants' suggestion that Plaintiffs have no proof that USPAP compliance was material in the mind of a reasonable loan applicant in deciding whether to pay the appraisal fee is absurd on its face.  As Defendants concede, materiality is satisfied "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, 2017 WL 2559615, at *7 (C.D. Cal. June 7, 2017).

At the outset, the Court evaluated Defendants' argument at the class certification stage and rejected it.  "In light of plaintiffs' allegations that they were required to pay for illegitimate and pre-textual appraisals that systematically violated USPAP, the Court finds that a full refund could be found to be an appropriate remedy and therefore plaintiffs' damages model is consistent with their theory of liability."  Dkt. 248, p. 38.

Nevertheless, Defendants concede that the definition of an "appraisal" includes a requirement that it be USPAP compliant.  SDF 128.  In fact, Defendants promised and represented that all appraisals performed by LandSafe were USPAP compliant because that was a legal and investor requirement for loan closing, packaging, and then selling those loans in securitized pools. SDF 129.

Defendants' strategic business plan focused on profiting from loan origination and

servicing fees, while offloading the credit risk onto the secondary market.[3]  SDF 130.

Defendants claim that Plaintiffs have no class-wide evidence that they and every absent class member would have refused to pay the appraisal fee but-for the appraiser's certification that the appraisal complied with USPAP.  Defendants reason that each of the Plaintiffs paid for the appraisals because doing so was part of applying for a loan—*"which is what they wanted."* But Defendants miss a critical element in their analysis— they ignore the fact that a USPAP compliant appraisal was, in fact, required to close *every* class member's loan transaction.  SDF 16.  And so, according to Defendants' own reasoning, every class member would obviously think it was material that their appraisal be USPAP compliant for the very reason that it was necessary to close their loan.  Stated differently, no reasonable borrower would have paid the fee at the outset if they knew that their appraisal was not USPAP compliant ***and*** that to obtain their loan a USPAP compliant appraisal was necessary.

Moreover, to the extent Bank of America, *which is a federally insured financial institution*, wants to argue "on the record" that borrowers paid an appraisal fee to get a loan, and that it should not matter that the loans were extended as a result of Defendants' fraud on borrowers and investors, let them.  Plaintiffs are certain that position would be of keen interest to federal regulators, as well as Defendants' shareholders.

Finally, as the Supreme Court has held, first party reliance is not required to plead a RICO violation.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008); see also *In re Actimmune Mktg. Litig.*, 614 F.Supp.2d 1037, 1052 n.7 (N.D. Cal. 2009)

---

[3] Defendants' Strategic Business Plan stated: "If the loan is sold on the secondary market, Countrywide and Full Spectrum normally retain the servicing responsibilities…. For Countrywide…, the credit risk is eliminated when a loan is sold because the credit risk is transferred to the investor or insurer.  Because the mortgage banker no longer owns the loan, it also no longer owns the risk associated with the loan.  With no credit risk and more money available, the mortgage banker can generate more income.  First, it can originate more loans collecting more origination fees.  Secondly, it can service the sold loans collecting servicing fees from the investors."  SDF 130.

("[T]he Supreme Court has held that detrimental reliance by a plaintiff is not required to sustain a RICO claim predicated on mail fraud").  The reliance here does not need to be on the part of Plaintiffs, instead the fact that it was falsely represented to third party investors that the loans they were being sold were supported by USPAP compliant appraisals provides an independent basis to satisfy the RICO elements.[4]

### C.    The Holding Company Defendants Engaged in the Enterprise's Conduct

Here, Bank of America Corporation, Countrywide Financial Corporation, and LandSafe, Inc., all pursued the common interest of the enterprise by controlling their subsidiaries and guiding that enterprise through that control.  SDF 131. These Defendants each directed the affairs of their subsidiaries that originated loans or conducted appraisals pursuant to corrupt practices that were central to the enterprise's affairs.

Patrick Ames testified that he believed he was "designated as an employee of LandSafe, Inc." SDF 132.  Similarly, Todd Baur testified that his employment changed from LandSafe Appraisal Services, Inc. to LandSafe, Inc.  SDF 133.  Both of these senior officers were instrumental in Defendants' appraisal scheme.

In addition, in its Acknowledgement of Receipt of Employee Handbook (provided to all LandSafe personnel), Countrywide conveyed the message that the policies and procedures for appraisal practice may only be "expressly modified in writing by the *Chairman of Countrywide Financial Corporation, or the President of Countrywide Home Loans,* Inc."  SDF 134 (emphasis added).

In connection with their arguments related to Bank of America Corporation, Defendants cite to their 10-K filing indicating that they are a "bank holding company and financial holding company under the Gramm-Leach Bliley Act" and they cite to an FFIEC document stating that a Bank Holding Company is "a company that *controls* one or more

---

[4] In its ruling granting class certification, this Court addressed this issue and held: "More importantly, defendants' representations of USPAP compliance need not necessarily have been communicated directly to the class members because proof of reliance is not required under RICO to establish causation."  Dkt. 248, p. 29.

Case No.:  2:13-cv-08833-CAS(AGRx)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

U.S. banks." SDF 135 (emphasis added).

In light of the control and participation of these "holding" companies, summary judgment is inappropriate.

### D.   Plaintiffs' RICO Claim Is Properly Based on Defendants' Mail and Wire Fraud

Defendants represented that they were providing an appraisal that met a certain standard, charged class members for an appraisal that purportedly met that standard, and then did not give class members what they paid for.  SDF 128, 136.  Defendants then used the mail and wires to perpetrate that fraud on 2.4 million class members.  SDF 137.  Such conduct falls squarely within the purview of a RICO claim.

Recognizing these facts, Defendants argue that Plaintiffs' claims are an attempt to enforce USPAP, but Defendants are wrong. And even if Plaintiffs were seeking to enforce USPAP, which they are not, Plaintiffs' claims are still proper. FIRREA's enforcement provision holds that "[i]nstitutions and institution-affiliated parties … may be subject to … the imposition of civil money penalties pursuant to the Federal Deposit Insurance Act … *or other applicable law*" for violating USPAP standards. 12 C.F.R. § 47 (emphasis added). As *Bolden v. KB Home* notes, "[e]ven as to federally related transactions, the FIRREA does not provide an exclusive federal remedy for unlawful appraisal practices." 618 F. Supp. 2d 1196, 1204 (C.D. Cal. 2008).

That FIRREA does not provide an exclusive federal remedy distinguishes the facts here from the cases cited by Defendants. Def. MSJ, at p. 21:16-17 (quoting *McCulloch v. PNC Bank, Inc.,* 298 F.3d 1217, 1221 (11th Cir. 2002)(exclusive right to enforce HEA belonged to Secretary of Education); *see also Woolsey v. J.P. Morgan Ventures Energy Corp.*, No. 15CV530-WQH-BGS, 2015 WL 6455571, at *9 (S.D. Cal. Oct. 26, 2015), aff'd, 691 F. App'x 308 (9th Cir. 2017) (FERC has exclusive authority to remedy violations of the FPA). *Hess v. Wells Fargo* stands for the limited holding that there is no private right of action to bring a separate FIRREA claim. 2013 WL 791494, at *5 (N.D. Cal. 2013). Plaintiffs have brought no stand-alone FIRREA claim here. Third Amended

Complaint, Dkt. 46 at 23:9-33:19.

Plaintiffs' claims do not seek to enforce USPAP.  Nevertheless, federal law allows for independent actions like this one to hold these Defendants legally responsible for the injury caused to Plaintiffs and other class members.

## V. UNJUST ENRICHMENT IS A PROPER CAUSE OF ACTION UNDER TEXAS LAW

The Texas Supreme Court has recognized unjust enrichment as a cause of action under Texas law. *See e.g., Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) ("A party may recover under the unjust enrichment theory when one person has obtained a benefit by fraud . . .'"); *see also BMG Direct Mktg. v. Peake*, 178 S.W.3d 763, 770 (Tex. 2005) ("[A]n adequate legal remedy may render equitable claims of unjust enrichment and equitable defenses of voluntary-payment unavailable."). So too have Texas's appellate courts. *See e.g., Freeman v. Harleton Oil & Gas, Inc.*, 528 S.W.3d 708, 742 (Tex. App.-Texarkana 2017).

Defendants are not entitled to judgment as a matter of law on Waldrup's Texas unjust enrichment claim.

## VI. PLAINTIFFS' CLAIMS ARE TIMELY

The undisputed evidence leaves no question that both the "injury discovery" rule and equitable tolling apply in this case. "The civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir.1996) (internal quotation marks omitted). "Thus, the 'injury discovery' rule creates a disjunctive two-prong test of actual or constructive notice, under which the statute begins running under either prong." *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001). Equitable tolling "differs from the [discovery rule] in that the plaintiff is assumed to know that he has been injured, so that the statute of limitations has begun to run; but he cannot obtain information necessary to decide whether the injury is due to . . . wrongdoing by the defendant." *Garcia v. Brockway*, 526 F.3d 456, 465 (9th Cir. 2008) (quoting *Cada v. Baxter Healthcare Corp.*,

920 F.2d 446, 451 (7th Cir.1990).

Defendants argue that Plaintiffs and absent class members were on notice of their claims at some point in 2009. Def. MSJ at 23:17-24:4. But Defendants are wrong. Defendants remained in sole possession of the information, including internal documents necessary to bring forward these claims, long after the last appraisal fee was paid.  SDF 87.

On May 13, 2009, whistleblower Kyle Lagow's *qui tam* complaint against Defendants was filed under seal. *United States of America ex rel. Kyle Lagow v. Countrywide Financial Corporation, et al.*, Case No. 1:09-cv-02040-RJD-JMA (E.D.N.Y. May 13, 2009) at Dkt. 9.  The allegations contained in Lagow's Complaint laid out for the first time Defendants' previously undisclosed internal policies, procedures, and practices that formed the basis for the RICO enterprise. SDF 87-95.[5]  But because Lagow's Complaint was sealed in May 2009, no class member had access to its allegations. Thus, class members were precluded from meaningfully investigating any claims.  SDF 87.

Not surprisingly, Defendants completely ignore Lagow's Complaint in their statute of limitations analysis.  Instead, Defendants focus on class member complaints to Countrywide of "overvaluation," online articles discussing topical components Defendants' business, and limited communications with counsel as evidence of notice. Def. MSJ, at p. 23:17-24:5.  However, this case is about Defendants' internal policies and procedures that corrupted the appraisal process *after* appraisals were delivered to LandSafe, facts that only became available to Plaintiffs after the Lagow Complaint was unsealed.  Moreover, Defendants fail to explain how plaintiffs' could have investigated these issues considering, Defendants continue to deny the existence of a claim to this day. SDF 44.  Without facts about the internal processes of Defendants, these complaints merely show that a small number of borrowers disagreed with the value conclusions

---

[5] Lagow has since provided sworn testimony in this case confirming his allegations.  See i.e. SDF 6, 18, 57.

reached by appraisers.  Lastly, the online articles referred to by Defendants likewise did not raise concerns regarding Defendants' internal policies and procedures, or otherwise provide a sufficient basis for anyone to investigate or determine the RICO violations pled here.  Def. MSJ, citing SUF 48-49, 62.  More importantly, the articles discussing Defendants' appraisal practices were *all* published *after* the Lagow Complaint was sealed in May 2009.  Def. SUF 48-49, 62).  Similarly, Defendants have provided no evidence that any of the Plaintiffs corresponded with counsel until months after the Lagow Complaint was sealed.  Plaintiffs' decision to contact counsel demonstrates diligence in pursuing their claims.  But it also highlights that without the information contained in the Lagow Complaint, Plaintiffs lacked the knowledge needed to determine what or if wrongdoing by Defendants caused their injury and obviously counsel were precluded from sharing information contained in a sealed complaint.

Lagow's complaint was not unsealed until February 24, 2012. SDF 87.  The *Waldrup* Complaint was first filed on November 27, 2013, which is within two years of the unsealing of Lagow's complaint.  Thus, Plaintiffs' claims are timely.

## VII.  GENUINE ISSUES OF FACT REMAIN AS TO WALDRUP'S INDIVIDUAL CLAIMS

Defendants admit that all of Waldrup's individual claims have three or four year statutes of limitations. Def. MSJ, at p. 22-24. As discussed above, the *Waldrup* Complaint was first filed within two years of the unsealing of Lagow's complaint.  SDF 87.  Thus, Waldrup's individual claims are timely.

Waldrup relied on Defendants' misrepresentations. "Actual reliance occurs when a misrepresentation is 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations,' and when, absent such representation, 'he would not, in all reasonable probability, have entered into the contract or other transaction.'" *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 919 (1997)). "[T]o prove reliance on an omission[,] [o]ne need only prove that, had the omitted information been disclosed, one would have been aware of it and behaved differently."). *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093

(1993). Waldrup testified on this very issue.  Her appraisals were represented as USPAP compliant.  SDF 138.  Had Waldrup known that they were not, she would not have paid for them.  SDF 139.  We now know that absent a USPAP-compliant appraisal, Waldrup's loans could not have closed without Defendants' fraudulent misrepresentations to Waldrup, federal regulators, and investors.  SDF 36.  Clearly, genuine issues remain as to Waldrup's fraud claim.

Waldrup's allegation of fraud forms the basis for a claim under the "fraudulent" prong of the UCL. Waldrup's UCL claim also survives based on the unlawful prong.  As discussed above, genuine issues remain as to Waldrup's class claims. Moreover, Waldrup's claim that she paid for—but did not receive—USPAP-compliant appraisals are well-supported by the facts.  SDF 95, 124.  "When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221 (2014)). Waldrup's unjust enrichment claim also supplies a claim under the "unlawful" prong of the UCL.

## VIII. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motion in its entirety.

Dated:  October 14, 2019          BARON & BUDD, P.C.

By:  /s/ Roland Tellis
          Roland Tellis

          Daniel Alberstone
          Roland Tellis
          Mark Pifko
          Evan Zucker
          Elizabeth Smiley
          BARON & BUDD, P.C.
          15910 Ventura Boulevard, Suite 1600
          Encino, California  91436
          Telephone:  (818) 839-2333

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Christopher R. Pitoun
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 920
Pasadena, California 91101
Telephone:   (213) 330-7150
Facsimile:    (213) 330-7152

Steve W. Berman
Thomas E. Loeser
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:   (206) 623-7292
Facsimile:    (206) 623-0594

Attorneys for Plaintiffs
BARBARA WALDRUP, ELIZABETH
WILLIAMS, BECKIE REASTER,
REBECCA MURPHY individually, and on
behalf of the certified classes

Case No.:  2:13-cv-08833-CAS(AGRx)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT