Daniel Alberstone (SBN 105275)
dalberstone@baronbudd.com
Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
Evan Zucker (SBN 266702)
ezucker@baronbudd.com
Elizabeth Smiley (SBN 318165)
esmiley@baronbudd.com
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333

Steve W. Berman (*pro hac vice*)
steve@hbsslaw.com
Thomas E. Loeser (SBN 202724)
toml@hbsslaw.com
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

Christopher R. Pitoun (SBN 290235)
christopherp@hbsslaw.com
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 920
Pasadena, California  91101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152

Attorneys for Plaintiffs
BARBARA WALDRUP, ELIZABETH
WILLIAMS, BECKIE REASTER,
REBECCA MURPHY individually, and
on behalf of the certified classes

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| BARBARA WALDRUP, individually, and on behalf of other members of the general public similarly situated,<br><br>Plaintiff,<br>vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, et al.,<br><br>Defendants. | Case Number:  2:13-cv-08833-CAS(AGRx) CLASS ACTION<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR CLASS DECERTIFICATION**<br><br>District Court Judge:  Christina A. Snyder<br>Magistrate Judge:  Alicia G. Rosenberg<br><br>Action Filed:  November 27, 2013<br>Trial Date:  January 14, 2020<br><br>Date:  November 18, 2019<br>Time:  10:00 a.m.<br>Location:  Dept. 8D |

1
2
3

ELIZABETH WILLIAMS, BECKIE
REASTER, REBECCA MURPHY,
individually, and on behalf of all others
similarly situated,

Consolidated with
Case Number:  2:16-cv-4166 CAS(AGRx)

4

Plaintiffs,

5

vs.

6
7

COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware
corporation, et al.

8

Defendants.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................... 1

II.  LEGAL STANDARD ............................................................................... 3

III.  DEFENDANTS VIOLATED THEIR ETHICAL DUTIES UNDER USPAP ........ 4

IV.  COMMON EVIDENCE ESTABLISHES DEFENDANTS' UNLAWFUL
     APPRAISAL SCHEME ............................................................................ 9

     A.  The Thirteen Policies....................................................................... 9

     B.  Common Evidence Reveals a Corporate Culture Engineered to Corrupt
         the Appraisal Process ................................................................... 13

     C.  Common Evidence Establishes the Corruption of LandSafe's
         Appraisal Process ......................................................................... 15

     D.  There Is No Basis to Narrow the Class on the Grounds that an
         Appraisal Was Performed by a "Staff" and Not a "Fee" Appraiser ............. 17

     E.  Common Evidence Confirms that Defendants' Conduct Violated
         USPAP ......................................................................................... 17

V.  DEFENDANTS FAIL TO OVERCOME THE CLASS-WIDE EVIDENCE
    AND INSTEAD INVENT PURPORTED INDIVIDUAL INQUIRIES ............... 19

VI.  CONCLUSION...................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Autozone, Inc.*,
   2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ...............................................24

*Campusano v. BAC Home Loans Serv., LP*,
   2013 WL 2302676 (C.D. Cal. Apr. 29, 2013) ................................................24

*Cholakyan v. Mercedes-Benz, USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. 2012) ...................................................................23

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
   227 F.R.D. 586 (S.D. Cal. 2011) ....................................................................23

*Cummings v. Starbucks Corp.*
   2014 WL 1379119 (C.D. Cal. Mar. 24, 2014) ...............................................24

*In re First American Corp. ERISA Litigation*,
   258 F.R.D. 610 (C.D. Cal. 2009) ...................................................................25

*Kempf v. Barrett Bus. Servs., Inc.*,
   336 F.App'x 658 (9th Cir. 2009) ....................................................................24

*Marlo v. United Parcel Service, Inc.*
   251 F.R.D. 476 (C.D. Cal. 2008) ..................................................................... 4

*O'Connor v. Boeing North American, Inc.*
   197 F.R.D. 404 (C.D. Cal. 2000) ..................................................................... 3

*Slaven v. BP America, Inc.*
   190 F.R.D. 649 (C.D. Cal. 2000) ..................................................................... 4

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016).................................................................................... 6

**Other Authorities**

Federal Rule of Civil Procedure 26 ........................................................................ 7

Federal Rule of Civil Procedure 701 ...................................................................... 7

Federal Rule of Civil Procedure 702 ...................................................................... 7

## I.     INTRODUCTION

Defendants' entire decertification bid rests on a false premise—that Plaintiffs' claims rise or fall on their ability to prove the corrupt intent of each and every appraiser. But Defendants were wrong when they first raised this issue years ago, and they are wrong now.  In granting class certification, this Court noted "plaintiffs emphasize that their theory of liability does not depend on whether any particular appraisal was overvalued."  Dkt. 248 at p. 25.  And, earlier this year the Court cautioned Defendants that "[t]he individual thought process of the appraisers I don't think has the significance that you argue for."  Declaration of Rolland Tellis ("Tellis Decl.,") at Ex. 42, pp. 5-18.  Yet Defendants persist and, in doing so, feign a fundamental misunderstanding of the case.

As this Court knows, Plaintiffs' claims are based on uniform, companywide practices and policies set by Countrywide, and implemented by LandSafe.  In granting class certification, this Court found "that plaintiffs have offered a class-wide method of proving uniform USPAP violations based on the allegedly improper relationship between Landsafe and Countrywide in addition to their company policies and practices."  Dkt. 248 at p. 28.  These practices and policies corrupted the appraisal process ***for each and every appraisal*** that passed through LandSafe before they were delivered to Countrywide, and later Bank of America.  Plaintiffs' case does not, as Defendants suggest, implicate the state of mind of ***any*** individual appraiser.

To put a finer point on this fact, according to Plaintiffs' appraisal expert, J. Philip Cook ("Cook"), LandSafe was an appraisal management company ("AMC"), and as such was subject to the same overarching ethical guidelines of the Uniform Standards of Professional Appraisal Practice ("USPAP") as individual appraisers.[1]  Additionally, Cook

---

[1] According to USPAP: "This Rule specifies the personal obligations and responsibilities of the individual appraiser.  **However, it should also be noted that groups and organizations engaged in appraisal practice share the same ethical obligations.**" (Emphasis added.) USPAP, 2008-2009, Ethics Rule, p. U-7:201-203 (See Defendants' evidence appendix at Ex. C45).

Case No.:  2:13-cv-08833-CAS(AGRx)

notes that "[i]n addition to ordering appraisals from contract or fee appraisers, LandSafe also had a staff of in-house appraisers and trainees who performed appraisals and appraisal reviews. Accordingly, LandSafe was obligated to comply with USPAP."  Tellis Decl., Ex. 19, p. 195.

Furthermore, Cook's expert report shows that LandSafe recognized, ***in its own words***, that it maintained duties under USPAP as an appraisal management company because the company itself was engaged in appraisal practice ("***The final appraisal delivered represents a valuation 'warranted' by LandSafe Appraisal, not the individual fee panel or field staff appraiser***.  As such, LandSafe should be able to render a valuation that is different from any value provided by a fee panel member or field staff appraiser. The final LandSafe value should be able to be higher or lower or equal to the value presented as the result of field work completed.")  Tellis Decl., Ex. 19, p. 195.

Cook's opinion has been validated by Defendants themselves.  In fact, LandSafe's then President Patrick Ames testified that, "LandSafe being the provider of the valuation product to the client would make us the responsible party, and I think that's what the 'warranted' in quotes references, and we have taken responsibility for delivering a quality appraisal product."  Tellis Decl., Ex. 16, p. 149.  And Ames is not alone.  LandSafe's then CEO, Todd Baur, was more explicit, testifying that he "absolutely" agrees that LandSafe, having "warranted" the valuation of every appraisal delivered to Countrywide and Bank of America, had a duty to comply with USPAP.  ("Q: And do you agree that LandSafe under these circumstances reflected in here has a duty to comply with USPAP? A: Absolutely.")  Tellis Decl., Ex. 15, p. 139-142.

Thus, no different than an individual appraiser, LandSafe was subject to USPAP requirements that it perform assignments with "impartiality, objectivity, and independence, without accommodation of personal interests." And that is the gravamen of Plaintiffs' case.

Because LandSafe had the duty to comply with USPAP, it was expressly prohibited from accepting any assignment that included a request by its client (Countrywide or Bank

of America) to reach a "predetermined result."  USPAP, 2008-2009, Ethics Rule, p. U-8:243-245 (See Def. Evid. Appendix at Ex. C45).  But as detailed below, that is exactly what happened.  So although Defendants have focused their decertification bid on the conduct of individual appraisers, Plaintiffs' case continues to be based on the corrupt relationship between LandSafe and its client Countrywide, and later Bank of America, as well as the internal review process at LandSafe <u>after</u> the appraisals were delivered by the original appraisers. The good or bad faith intent of individual appraisers or their "thought process" is of no consequence to Plaintiffs' claims.  Plaintiffs' theory was the subject of this Court's class certification Order, and nothing raised by Defendants now undermines the sound reasoning of this Court's Order.

Finally, contrary to Defendants' claims, their motion for decertification is not based on any new facts.  The appraisal independence hotline logs that they rely upon for alleged absent class member impropriety were produced between November of 2016 and July of 2017.  The spreadsheet data "analyzed" by Garmaise is loan level data which has been in Defendants' possession since the beginning of this case, and the testimony of the class representatives was completed in August of 2017.  Defendants here have simply repackaged the arguments and evidence they already had when they opposed class certification in October of 2017.

For the reasons set forth above, and more fully developed below, Plaintiffs respectfully request that this Court deny Defendants' Motion for Class Decertification.

## II.   LEGAL STANDARD

A district court's order granting class certification is subject to a later motion modifying a class ruling or for decertification prior to final judgment under Fed. R. Civ. P. 23(c)(1)(C).  The standard is whether Rule 23 requirements are met.  *O'Connor v. Boeing North American, Inc.* 197 F.R.D. 404, 410 (C.D. Cal. 2000).  "[A] party seeking decertification of a class should bear the burden of demonstrating that the elements of Rule 23 have not been established.  Defendants' burden in urging decertification is relatively heavy, since doubts regarding the propriety of class certification should be

resolved in favor of certification." *Slaven v. BP America, Inc.* 190 F.R.D. 649, 651 (C.D. Cal. 2000) (citation omitted).

Moreover, courts in the Central District ruling on decertification motions generally analyze whether there are *changed circumstances* since the initial certification decision to determine if the class was appropriately certified. *Marlo v. United Parcel Service, Inc.* 251 F.R.D. 476, 480 (C.D. Cal. 2008). According to the leading treatise on class actions, "[l]ike any movant . . . a defendant seeking decertification or modification ought to be required to make *some showing of changed circumstances or law*, which would then trigger a plaintiffs' obligation to defend certification." Newberg on Class Actions § 7:39 (5th ed) (emphasis added). Defendants have failed to meet that burden here.

## III.   DEFENDANTS VIOLATED THEIR ETHICAL DUTIES UNDER USPAP

### A.   USPAP Compliance was a Legal and Licensing Requirement and Considered an Appraiser's "Bible"

To be certain, this is not a "gotcha" moment for Defendants. USPAP is considered the "Bible" by which appraisers and AMC's are judged. Def. Mtn., p. 8:9. In fact, Defendants' own internal policies, as well as federal law, required that USPAP be followed by LandSafe. And, in every state Defendants do business, they were contractually obligated with that state's licensing board to conduct appraisal services in conformity with USPAP and relevant state appraisal laws. Tellis Decl., at Ex. 60, pp. 634-35.

Moreover, in order for an appraiser to render an opinion of value in compliance with his or her license, that value estimate must conform to USPAP standards. *Id.* at Ex. 57, pp. 568-69. In addition, prospectuses issued by Countrywide to those persons and entities that invested in the pools of loans it securitized expressly represented that all appraisals performed in connection with those securitized loans were USPAP compliant. *Id.* at Ex. 35, pp. 408-10. Lastly, USPAP expressly provides that its purpose is "to promote and maintain a high level of public trust in appraisal practice. . ." USPAP, 2008-2009, Preamble, p. U-6:153-154 (See Def. Evid. Appendix at Ex. C45).

Thus, a violation of USPAP arguably equates to a violation of the public trust. These facts alone clearly demonstrate the materiality of these requirements.

### B.    Landsafe Manager Kyle Lagow Blows the Whistle on Defendants' Corrupt Conduct.

Defendants suggest that Plaintiffs' case rests solely on the internal policies and practices of Countrywide and LandSafe. But that is not true. Rather, as detailed below, there is substantial class-wide evidence that Plaintiffs have uncovered in discovery, including through the unrefuted deposition testimony of whistleblower Kyle Lagow, which establishes that Defendants' corrupt practices and policies impacted each class member. In fact, as a result of Lagow's whistleblower complaint, Bank of America agreed to pay nearly one billion dollars in settlements with the government to resolve Defendants' unlawful appraisal scheme.

In particular, Lagow testified that outside fee appraisers were pressured to inflate values through the use of "targeted values" and the threat of blacklisting, and that the staff appraisers were pressured directly by their employer, LandSafe, to inflate values falsely as necessary to close deals. Tellis Decl., at Ex. 17, p. 160. Lagow further confirmed that *Defendants' corrupt practices were company-wide, and did not depend on which division of Countrywide originated the loan. Id.* at Ex. 17, pp. 155-156.

### C.    Every Appraisal Was Reviewed by LandSafe

Defendants' effort to prove that not every appraisal was reviewed and that their policies were not implemented "uniformly," is refuted by the testimony of LandSafe's own employees. Sidney Miller, who was employed by LandSafe during the class period, and responsible for "[c]ompliance matters for all the LandSafe-related companies with the exception of title, which included any regulations relating to appraisal or appraiser independence," (Tellis Decl., at Ex. 11, pp. 92-93) confirmed under oath that ***"every appraisal was reviewed for consistency, correctness, compliance with guidelines, including USPAP."*** *Id.* at Ex. 11, pp. 94-95. Moreover, Miller's testimony is buttressed by Patricia Godfrey, a First Vice President in Countrywide's Risk Department, who

testified that "all appraisals coming into LandSafe got some level of review.  It wasn't confined to appraisals that supposedly warranted the value expected.  ***It was all appraisals.***"  *Id.* at Ex. 12, pp. 104-107 (emphasis added).

Defendants cite to *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016), for the proposition that the test for whether a body of evidence can establish class-wide liability is whether "each class member could have relied on that [same evidence] to establish liability if he or she had brought an individual action."  Def. Mtn. p. 3:20-23.  Here that standard is met, since evidence of whether the appraisals were not USPAP compliant as a result of "LandSafe's business and quality control processes" is uniform and applicable to every appraisal, as well as every class member, *since every appraisal was reviewed and subject to these policies.*

### D.    The "Expert" Report and Testimony of Mark Garmaise is Neither Credible nor Reliable, and Should be Disregarded by the Court

In an effort to prove that not every class appraisal was impacted by Defendants' policies, Defendants lean heavily on statistics provided by their expert, Mark J. Garmaise.  In particular, Defendants use Garmaise in an effort to establish that Defendants' internal policies were not "uniform," but rather applied to different subsets of class members.  However, Garmaise's report and opinions are neither credible nor reliable, and most importantly, not admissible, as Garmaise blindly relied on his employer, Cornerstone Research, to interpret the data upon which he based his statistical opinions without any knowledge, or even curiosity on his part, concerning the source, credibility or reliability of the information that was provided to him and upon which he relied to form his opinions.

Critically, Garmaise received a "dataset" from Cornerstone upon which his report relies, but his interpretation of that data is inconsistent and was based on second-hand knowledge from employees of Cornerstone (who themselves also had no personal knowledge).  Shockingly, Garmaise never even asked these employees where they obtained the information upon which they themselves relied to interpret the data and upon

which, in turn, Garmaise relied in forming his opinions.  Tellis Decl., at Ex. 10, pp. 74-79. Absent any information concerning the data's reliability, its interpretation or, at the very least, a data dictionary (*Id.* at Ex. 10, pp. 78-84) to explain the data to him, Garmaise was left to guess as to how to interpret these data elements.  For example, he interpreted the data element "NULL" in multiple ways to manufacture the low percentages contained in his report.  *Id.* at Ex. 10, pp. 85-86 (Identifying "NULL" as missing data in one place in the table and as the lack of an entry in another.)

The facts get worse for Defendants.  Garmaise never even asked Cornerstone whether anyone there spoke directly with anyone from Bank of America or Countrywide to obtain the information needed to interpret the data.  And when asked at deposition whether he had any idea who Cornerstone spoke with to gain knowledge regarding what they believed the information contained in the dataset meant, Garmaise testified that for "at least some fields, the people at Cornerstone did report to me that they would ask questions of Defendants' counsel."  *Id.* at Ex. 10, pp. 83-84.  But when Plaintiffs' counsel attempted to drill down during Garmaise's deposition on what Cornerstone was told by Defendants' counsel to interpret the dataset, Garmaise refused to answer based on the instruction of Defendants' counsel that those communications were privileged.  *Id.* at Ex. 10, p. 88.

Of course, it is fundamental that Rule 26 does not protect communications between counsel and an expert to the extent those communications "identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed." Fed. Rule Civ. Proc. § 26(b)(4)(C)(ii).  Yet Defendants refused to allow Garmaise to testify regarding those communications.  Tellis Decl., at Ex. 10, p. 88.  Since Garmaise's report fails to meet the requirements of Fed. Rules Civ. Proc. §§701 and 702, and violates Rule 26, the Court should disregard his opinions.

## E. Defendants' Attack on Class Members Is Factually Wrong But Of No Consequence to Plaintiffs' Claims

Defendants also appear to make an unseemly effort to ridicule class members,

intimating they were simply too ignorant to even know what USPAP was, and that because of their own corruption only cared about obtaining a loan regardless of whether their appraisal was USPAP compliant.  The Court should not be misled.  As discussed in section V.B. below, these quotes are, to be generous, taken out of context.  To be sure, Defendants are merely attempting to distract this Court by inappropriately shifting responsibility to unsuspecting class members.

In any event, the desires of borrowers are not a defense to Plaintiffs' claims.  If, as Plaintiffs' complain, none of the appraisals delivered by LandSafe were USPAP compliant, and Defendants were honest and disclosed this fact to regulators and investors (not to mention borrowers), none of the loans could have closed, regardless of what borrowers wanted.  In fact, Garmaise agreed under oath that if every appraisal performed by LandSafe was non-USPAP-compliant as Plaintiffs claim, and Defendants had not ignored their own internal policies that required USPAP compliance, they would not have made any loans.  Tellis Decl., at Ex. 10, pp. 89-90 (emphasis added).

## F.     Plaintiffs Have Identified Specific Rules and Standards Under USPAP That Defendants Have Violated

Defendants also argue that Plaintiffs have failed to cite to any actual USPAP provision that the appraisals violated.  Defendants are mistaken, as throughout this litigation Plaintiffs have repeatedly pointed to the rules and standards that Defendants have violated.  For instance, the Ethics Rules under USPAP required LandSafe as an AMC to "perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."  USPAP, 2008-2009, Ethics Rule, p. U-7:219-220 (See Def. Evid. Appendix at Ex. C45).  USPAP also cautions that AMC's like LandSafe "must not accept an assignment that includes the reporting of predetermined opinions and conclusions," or to accept an assignment contingent on a "direction in assignment results that favors the cause of the client" or "the amount of a value opinion." USPAP, 2008-2009, Ethics Rule, p. U-8:246-247 (See Def. Evid. Appendix at Ex. C45). As detailed below, there is class-wide evidence that Defendants violated USPAP in

various ways.

## IV.  COMMON EVIDENCE ESTABLISHES DEFENDANTS' UNLAWFUL APPRAISAL SCHEME

Defendants continue to misrepresent the class-wide impact of Defendants' company-wide policies and the common evidence that supports Plaintiffs' claims.

### A.  The Thirteen Policies

First, Defendants challenge the thirteen policies Plaintiffs identified to the Court on October 31, 2018.  Dkt. No. 316.  In essence, Defendants argue that these policies are not "uniform" at all. But as shown below, Defendants are wrong.

**Policy No. 1:**  Defendants argue that this policy applied only to "staff appraisers." But that is not true.  This unwritten policy, which is evidenced by W-2 forms, provided that <u>all</u> LandSafe personnel, including review appraisers and managers, are actually employed and compensated by Countrywide.  Tellis Decl., at Ex. 24, p. 323-327. ***This uniform policy impacted all class members***, a fact Defendants do not dispute.

**Policy No. 2:** Defendants likewise argue that this policy, which required all LandSafe personnel to acknowledge receipt of Countrywide's Employee Handbook, applied only to "staff appraisers."  But, again, this policy also required all LandSafe review appraisers and managers to acknowledge receipt of this handbook as well.  Most critically, the Handbook includes the following terms (Tellis Decl., at Ex. 57, pp. 566-567):

> I understand that the policies in the Handbook recite the terms and conditions of my employment *unless expressly modified in writing by the Chairman of Countrywide Financial Corporation, or the President of Countrywide Home Loans, Inc.*
>
> &ast;&ast;&ast;
>
> I further understand that *Countrywide, in its sole and absolute discretion, reserves the right to supersede, modify, supplement, or eliminate any policy, practice, or benefit* described in this Handbook, at any time.
>
> &ast;&ast;&ast;
>
> I also acknowledge that *my employment with Countrywide is at will*, by mutual consent between Countrywide and me, and that it may be

terminated by either party, at any time, with or without cause and with or without notice.

Tellis Decl., at Ex. 1, p. 1 (emphasis added).

Thus, it is a fact that LandSafe appraisers were explicitly operating at the direction and under the control of Countrywide, the lending entity.  In other words, their job duties and the conditions of employment were determined, not by LandSafe, but by the loan originator—Countrywide.  In fact, their hiring was contingent upon their "acceptance of all policies, procedures and guidelines of LandSafe Appraisal Services, Inc."—this provision applied to both staff and so called non-employee fee appraisers.  Tellis Decl., at Ex. 14, p. 124; *see also* Tellis Decl., at Ex. 2, p. 9.  Again, Defendants' percentages are neither credible nor reliable, and should be disregarded. Lastly, ***this uniform policy impacted all class members,*** a fact that Defendants do not dispute.

**Policy No. 3:** Defendants do not challenge this policy, which provided that Countrywide set appraisal Policy for LandSafe, including any and all policies related to appraisal review requirements.  Tellis Decl., at Ex. 34, p. 398.

**Policy No 4:** Here, again, Defendants argue that this policy, which was an Incentive Plan for "review appraisers" and was implemented and governed by Countrywide, only applied to staff appraisers.  But that is demonstrably false as the policy, by its own terms, was intended to "reward" *review* appraisers. This is a critical distinction as it is the appraisal review process at LandSafe that is at the heart of Plaintiffs' claims.  Tellis Decl., at Ex. 43, p. 462.

In addition, Defendants rely on the inadmissible testimony and expert report of Mark J. Garmaise to establish the percentage of appraisals they claim were reviewed by "staff appraisers."  However, as shown above, those percentages are neither credible nor reliable, and should be disregarded.  Moreover, besides the unreliability of Garmaise's testimony, Defendants ignore the fact that ***100% of all appraisals delivered to LandSafe are reviewed by a LandSafe review appraiser***.  Tellis Decl., at Ex. 11, pp. 94-95; *Id.* at Ex. 12, pp. 104-107.  As with the others, ***this uniform policy also impacted all class***

Case No.:  2:13-cv-08833-CAS(AGRx)

*members*, a fact Defendants do not dispute.

**Policy No. 5:** This policy authorized "review" appraisers to increase the final value reached by the original appraiser by as much as 10% of the original appraised value if the original appraiser cannot be reached or is unwilling to agree to the increase in value. ***This policy applied to every Countrywide loan that passed through LandSafe.*** Tellis Decl., at Ex. 4, p. 21. This uniform policy provided that it was intended to assist Countrywide "with closing loans faster, cheaper, better." *Id.* at Ex. 4, p. 22. It is apparent from the policy that it was intended to allow review appraisers to increase the value in order to hit the "target" value and close loans.

**Policy No. 6:** Defendants challenge LandSafe's company-wide Missed Purchase Price Policy (*see* Tellis Decl., at Ex. 39, 40) based on percentages provided by Garmaise. However, as set forth above, these percentages are neither credible nor reliable, and should be disregarded. ***This uniform policy applied to all class members*** since every appraisal was reviewed, and a determination was made as to whether the appraiser missed the purchase price in their value conclusion, a fact Defendants do not dispute.

**Policy No. 7:** Defendants challenge the import of this policy by arguing that Plaintiffs are wrong that "turn times" (i.e., the amount of time between the acceptance of an appraisal assignment and the delivery of that assignment to the lender), as well as performance ratings, are not impacted by the time it takes to conduct an appraisal review. But Plaintiffs are <u>not</u> wrong. Under the Missed Purchase Price Policy, any appraisal that is not equal to or greater than the sale price must be sent by the appraiser for review ***prior to uploading the file.*** *See* Policy No. 6. Thus, Defendants' reliance on the deposition testimony of Tracy Sanderson is misplaced as she ***agreed*** that an appraisal report is not "delivered" until it is uploaded into LandSafe's appraisal system. Tellis Decl., at Ex. 38, pp. 418-420. Moreover, ***this uniform policy applied to all class members***, a fact Defendants do not dispute.

**Policy No. 8:** As it relates to the Appraiser Selection Policy (*see* Tellis Decl., at Ex. 46), again, Defendants' percentages are neither credible nor reliable, and should be

disregarded as they are based on Garmaise's unsupported opinion.  Moreover, ***this uniform policy applied to all class members*** (*see* Tellis Decl., at Ex. 17, pp. 161, 164), a fact Defendants do not dispute.

**Policy No. 9:**  Defendants argue that this policy is not evidence of improper influence.  Under this policy, the final appraisal delivered to Countrywide represented a valuation "warranted" by LandSafe, not the individual appraiser, and that, as such, LandSafe could render a valuation that is different from any value provided by the original appraiser, including a higher value than presented by the original appraiser. In other words, this policy took the "final" valuation out of the hands of the appraiser and placed it into the hands of LandSafe, which had final say as to the value being presented to Countrywide regardless of the valuation reached by the original appraiser.  Tellis Decl., at Ex. 3.  Clearly, this common evidence represents indicia of the corrupt process and relationship that existed between LandSafe and Countrywide/Bank of America. ***This uniform policy applied to all class members***, a fact Defendants do not dispute*.*

**Policy No. 10:** Defendants' only challenge to this policy is that given the low percentage of appraisals that had their value increased by 1-2% it had no effect on a majority of appraisers.  But, again, Defendants' reliance on these percentages is misplaced as they are based on Garmaise's unsupported opinion, and should be disregarded. Moreover, LandSafe's President suggested that the appraiser value opinions should be increased if the appraiser "missed the [target] value" in order to close the loan, which is prohibited under USPAP.  Tellis Decl., at Ex. 44, pp. 466, 469. ***This uniform policy applied to every class member***, a fact that Defendants do not dispute.

**Policy No. 11:** Defendants challenge the target/requested value policy based on their suggestion that the policy only affected 60.3% of class appraisals.  But Defendants' percentages are neither credible nor reliable, and should be disregarded as they are based on Garmaise's unsupported opinion.  In any event, ***this uniform policy applied to all class members***, a fact not disputed by Defendants.

**Policy No. 12:** This policy addresses LandSafe's appraiser independence hotline.

Case No.:  2:13-cv-08833-CAS(AGRx)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR CLASS DECERTIFICATION

Defendants have pointed to this policy to suggest that they had implemented good governance practices and policies.  However, as Plaintiffs point out, this policy did not address any of the internal policies implemented by LandSafe that violated USPAP.  In other words, there was no internal policy that was implemented to ensure the internal appraisal policies themselves set by Countrywide were USPAP-compliant.

**Policy No. 13:** This policy required that as a condition of employment, all staff, review and fee appraisers alike must accept all policies, procedures and guidelines dictated by LandSafe and set by Countrywide.  This policy evidences that <u>all</u> appraisers were charged with knowledge of the policies referred to above.  Defendants argue that this policy is only objectionable "to the extent those other LandSafe policies are objectionable.  However, Plaintiffs submit that they have shown that each of them are, in fact, objectionable.

At bottom, Defendants uniformly required borrowers to obtain their appraisals from LandSafe (Tellis Decl., at Ex. 65, p. 692), uniformly misrepresented that such appraisals were, in fact, USPAP-compliant (Tellis Decl., at Ex. 3, p. 17), uniformly applied its internal review process, and then uniformly *required* borrowers to pay hundreds of dollars for each of these non-compliant appraisals.  Tellis Decl., at Ex. 33, pp. 380-381.  LandSafe was not an independent vendor; it was Countrywide's captive, wholly-owned subsidiary over which Countrywide exerted complete dominion, control, and influence.  Through LandSafe, Countrywide set LandSafe's policies, which allowed the lender to effectively control the entire process, including the ultimate valuation outcome of the non-compliant appraisals

### B.  Common Evidence Reveals a Corporate Culture Engineered to Corrupt the Appraisal Process

USPAP was designed to set guidelines for the appraisal *process*, largely to ensure appraiser independence.  It was <u>not</u> designed to control the ultimate opinion of value reached by a licensed appraiser, though the methodology for determining an opinion of value must meet certain procedural requirements.  Those requirements include absence of

bias, conformity with ethical practices, and independence from the parties to the transaction, including the lender and the borrower.  Tellis Decl., at Ex. 61, pp. 661-665.  Importantly, as Defendants' expert Trevor Philips testified, an appraisal can be non-USPAP complaint, but still reach an appropriate value.  *Id*. at Ex. 27, pp. 340-342, 343-347.  He continued by testifying that systemic issues present in LandSafe's business and quality control processes can render an appraisal non-compliant without that being apparent from looking at the appraisal report.  *Id.*

Not surprisingly, Defendants mostly dismiss the testimony of whistleblower Kyle Lagow who testified that he had direct percipient knowledge of LandSafe's national appraisal practices:

> Countrywide addressed the problem of independent appraisers coming in at actual value, impeding Countrywide's ability to sell homes at inflated values by its affiliation with LandSafe and their agreement to conspire in appraisal inflation.  Through LandSafe, Countrywide could: One, use its market power to pressure appraisers to inflate values to whatever Countrywide needed and punish appraisers who refused to play ball; and two, use fraudulent appraisal reviews to support fraudulently inflated appraisals and increase the values on accurate appraisal reports to arrive at the level needed to close the deal.

*Id.* at Ex. 17, pp. 156-157.

Lagow confirmed the reach of his knowledge and the basis for his testimony.  He testified that the appraisal corruption which served the basis for his *qui tam* case occurred company-wide and across all loan products.  *Id.* at Ex. 17, pp. 154-156, 161, 165, 167-171.  And, in response to repeated objections at his deposition by Defendants' counsel that Lagow's testimony was purportedly "speculative," Mr. Lagow testified:

> Can I say something about the objection?  And I don't mean to be rude.  They hired me, and there were no other appraisers in the staff – on the staff.  They hired me to build this thing…
>
> I covered areas all the way from California to Florida, the entire United States . . .

> This – there's no speculation.  I mean, I – I was involved in it.  I had access to all the systems.  I was the only guy – manager that lived in town where the corporate headquarters was.  I – I was – I was the only guy that had access to all of our systems.  I could go into all our systems and look at, see what was going on and where.

*Id.* at Ex. 17, pp. 172-174. Among other things, Lagow also testified that Todd Baur, President and COO at LandSafe, held a meeting with the appraisal managers where he admonished the managers to "stop thinking like appraisers and think instead like lenders trying to close a loan."  *Id.* at Ex. 17, p. 162-163.  This sentiment only underscores the culture present at LandSafe and Countrywide during the relevant time period.

## C.  Common Evidence Establishes the Corruption of LandSafe's Appraisal Process

First, all review appraisers were employed by Countrywide and assigned to work at LandSafe, and were thus <u>not</u> subject to the distinction Defendants attempt to make between "staff" appraisers employed directly by Defendants and outside "fee" appraisers.  As shown above, ***all appraisals were subject to LandSafe's review and post-appraisal procedures.***  Tellis Decl., at Ex. 11, pp. 94-95; Id. at Ex. 12, pp. 104-107.

In addition, all LandSafe review appraisers were participants in Countrywide Home Loans, Inc. Review Appraiser Incentive Plan (*Id.* at Ex. 43, p. 462), which created an indirect financial interest of staff reviewers in each appraisal transaction.  The Plan provided that it was "intended to reward the Review Appraiser[] for performance that supports the increasing growth and profitability of LandSafe Appraisal Services, Inc." The Incentive Plan was also subject to the terms and conditions of the CFC [Countrywide Financial Corporation] Incentive Plan Terms and Conditions, further evidencing the lender's direct involvement in the review appraisal process.  *Id.*

Kyle Lagow also testified that Defendants corrupted the appraisal process on a systematic basis, through practices that were applicable to each and every appraisal conducted nationwide, irrespective of internal company divisions or the type of loan being sold.  Tellis Decl., at Ex. 17, pp. 154-156, 158-159 (Discussing Lagow *qui tam* complaint,

at p. 3-4, 25, *see* Dkt. 171-3 at Ex. 17, pp. 206-207, 228.)  The improper practices Mr. Lagow identified, under oath, on a companywide basis included:

- "Blacklisting, retaliating against, auditing, and firing appraisers who refuse to corrupt their appraisal reports";
- "Allowing home developers to choose appraisers from an 'approved list' of corrupted appraisers who will appraise at pre-determined values"; and
- "Retaliating against those persons who question or criticize the pattern and practice of [Countrywide] to require inflation of *bona fide* appraisal to meet and included loan amount where that inflated appraisal does meet federal requirement and is simply the product of fraud and manipulation."

Value manipulation, target values, and predetermined values were the norm at Countrywide and LandSafe.  Lagow testified that when an order was sent to an appraiser, it was sent with an "expected value" on it.  Tellis Decl., at Ex. 17, p. 168.  Stunningly, Javier Jaraba, a Countrywide employee in charge of investigating appraisal independence violations testified that "there's nothing wrong with [a Countrywide employee] trying to hit a target value to close a loan."  *Id.* at Ex. 41, pp. 436-442.  Of course, Jaraba's views are directly at odds with the clear requirements of USPAP.

Defendants' corruption is evidenced in different ways.  For example, Jaraba provided testimony about a hypothetical policy providing that Countrywide would fire all appraisers whose values did not meet the sales price.  In his view, Jaraba did not believe that such a policy would rise to the level of inappropriate pressure.  (*Id.* 67-19-68:2.) Further, although Ames testified that a legitimate USPAP appraisal should reflect ***no*** value manipulation whatsoever (*Id.* at Ex. 57, p. 572a), LandSafe's practices show that its executives knowingly and routinely accepted value manipulations in its appraisals.  For instance, in response to a complaint from Lagow about an appraisal he believed was grossly manipulated, Evelyn Grevelle, the Regional Chief Appraiser in LandSafe's Governance Management Department, quipped: "***I personally disagree with a 10% variance but who am I to say how much risk the lender can have?  (Except as a tax payer who just got ripped-off.)***."  *Id.* at Ex. 62, p. 666 (emphasis added).

Both whistleblowers, Lagow and Robert Madsen, testified that corrupting appraisal

practices happened companywide and occurred in *all* lending divisions at Countrywide. *Id.* at Ex. 17, pp. 154-157; at Ex. 50, p. 492.  In fact, Madsen testified that LandSafe had procedures in place to improperly influence the appraisal process because it maintained a financial interest in the outcome of its appraisals.  *Id.* at Ex. 50, pp. 493-496.

### D.   There Is No Basis to Narrow the Class on the Grounds that an Appraisal Was Performed by a "Staff" and Not a "Fee" Appraiser

Defendants argue that the class should be narrowed to exclude the appraisals that were performed by so-called "third-party" or "fee" appraisers.  Def. Mtn. at p. 20 §I.D. Their argument is based on an unsupported assertion that fee appraisers did not receive, and were not subject to, LandSafe policies and procedures.  However, this argument ignores critical evidence that, as a condition of their employment, fee appraisers were required to accept "all policies, procedures and guidelines of LandSafe Appraisal Services, Inc."  Tellis Decl., at Ex. 13, p. 111.  David Mentesana, Executive Vice President at LandSafe, testified that LandSafe maintained a "Blast Fax Protocol" for providing policy and procedure documents to ***both staff and fee*** appraisers.  *Id*. at Ex. 20, pp. 294-296.  Indeed, Defendants considered all appraisers "employees."  *Id*. at Ex. 2, p. 9.  Furthermore, Defendants' "Functional Organizational Chart" identifies both in-house staff appraisers and fee-panel appraisers as "employees" subject to the LandSafe policies and procedures.  *Id.*

Defendants also opaquely make reference to a USPAP requirement that its "provisions on the 'interaction and dialogue' between Fee Appraisers and outside clients 'do not apply' to Staff Appraisers "within organizations."  Def. Mtn., p. 21.  However, any suggestion that there are two different standards in USPAP between staff and fee appraisers is contrary to the language of AO-19, and USPAP in general.

### E.   Common Evidence Confirms that Defendants' Conduct Violated USPAP

As Plaintiffs' USPAP expert Cook notes, the ethical obligations of USPAP apply not only to individual appraisers, but also to appraisal management companies:

It is commonly understood in the valuation industry that appraisers

17

> are obligated to comply with USPAP, and specifically, with its Rules and Standards.  Not as apparent, however, is that groups and organizations involved in appraisal practice also have compliance obligations under USPAP.

Tellis Decl., at Ex. 19, p. 195.

When Landsafe appraisers and reviewers are told, in writing, that their job procedures are determined by Countrywide (the lender), their paycheck and bonuses are paid by the lender, and their ability to be terminated is at the sole and absolute discretion of the lender (*Id.* at Ex. 1, p. 1), the question becomes whether undue influence has tainted the appraisal process from the outset.  That question is common to the class and applicable to the entire class for the entire class period.

Class-wide questions concerning a corrupt appraisal process also occur when (1) appraisers receive their paycheck and any bonus pay directly from the lender (*Id.* at Ex. 52, pp. 502-504; Ex. 43, p. 462; Ex. 53, pp. 516; Ex. 19, pp. 209-211); (2) appraisers are told that the appraisal entity, LandSafe, "reports" to the lender, Countrywide (*Id.* at Ex. 54, p. 527); (3) when appraisers are told that "LandSafe does not set Appraisal Policy for Countrywide, but rather the reverse is true"  (*Id.* at Ex. 34, p. 398); and (4) appraisers and review appraisers are told that if an appraisal fails to "find appropriate support" for the sales price, there will be negative consequences.  *Id.* at Ex. 39, pp. 427-428; Ex. 19, pp. 247-250.

Cook opines that "the Defendants through their policies, practices and procedures, systematically and uniformly failed to meet basic ethical rules of independence and impartiality in connection with the preparation and review of appraisals."  *Id.* at Ex. 19, p. 194.  He also opines that "the Appraisal produced by Defendants did not meet the Uniform Standards of Professional Appraisal Practice ("USPAP"), as Defendants represented[.]"  *Id.*

Cook notes that an AMC, like LandSafe, is a market participant, and because LandSafe's profitability was highly dependent on Countrywide's business due to the high percentage of business derived from that one source, it was especially important for there

Case No.:  2:13-cv-08833-CAS(AGRx)

to be a buffer between the AMC and the lender.  *Id.* at Ex. 19, p. 196.  However, LandSafe was a wholly owned subsidiary of Countrywide and its policies and procedures were created and approved by Countrywide.  *Id.* at Ex. 34, 398.  Any buffer that Defendants may point to was further negated when LandSafe represented that in addition to receiving its policies and procedures from the Countrywide, it ***reports*** to Countrywide as well.  *Id.* at Ex. 54, p. 527.

Defendants also point to the appraisal independence hotline to evidence that there were procedures in place to ensure independence they say created the buffer between the two entities.  However, Countrywide employees tasked with following up and taking action in response to complaints were given no authority to cancel an appraisal or order a second appraisal, or otherwise hold up the closing of a loan in any way, even in instances where a confirmed USPAP violation was identified.  *Id.*at Ex. 12, p. 108.

Any or all of these common facts, if determined to constitute a violation of USPAP, forms the basis for a class-wide claim here.  Whether or not these policies, individually or in the aggregate, violate USPAP is a merits question suitable for class-wide determination by a jury.

## V.   DEFENDANTS FAIL TO OVERCOME THE CLASS-WIDE EVIDENCE AND INSTEAD INVENT PURPORTED INDIVIDUAL INQUIRIES

Defendants attempt to focus on a selection of hearsay statements made by cherry-picked appraisers that were flatly disputed by absent class member in their deposition testimony.  In fact, Defendants' incendiary claims of class member "bribery" and improper influence went nowhere in these depositions. For instance, the absent class member questioned about allegations of bribery vehemently denied the accusation.[2] Tellis Decl., at Ex. 32, p. 376.  And it should not be lost on this Court that *the absent class member testimony obtained by Defendants here totals just three out of the 2.4 million class members*, thus forming no basis to decertify the class.

---

[2] In any event, Defendants point to no evidence or authority that the borrower has any duty whatsoever under USPAP.

Likewise, the appraiser testimony offered by Defendants (besides being self-serving) lacks any relevance or probative value since it focuses on the state of mind of appraisers.  In addition to failing to address the state of mind of "review" appraisers, the testimony also fails to address the numerous policies and procedures impacting managerial decisions put into play at the review and "business and quality control" stage. Critically, Defendants were unable to solicit any favorable testimony from the appraisers deposed about what happened to their appraisals <u>after</u> they were submitted to LandSafe. Unsurprisingly, each and every appraiser testified that they had no knowledge of what happened at LandSafe after their report was submitted.  *Id.* at Ex. 22, pp. 312-314 (Leung); Ex. 6, pp. 38-39 (Butler); Ex. 21, p. 306 (Hishinuma); Ex. 37, pp. 415-416 (Pyle); Ex. 8, pp. 58, 66 (Vu); Ex. 7, pp. 50-51 (Vande Vegte); Ex. 23, pp. 317-318 (Vanderbyl); Ex. 25, pp. 330-331 (Westergard); Ex. 26, p. 338 (Ricker).  Of course, this is the time period that matters.

Defendants also fail to disclose their methodology for selecting appraisers to be deposed.  This is a critical fact to the extent Defendants are implying that the Court should use their testimony as a basis to decertify the class.  To be sure, the appraisers deposed were selected by Defendants' counsel and represent *only 9 out of the approximately 21,000 appraisers* employed by Defendants during the relevant time period.  Notably, the appraisers who testified conceded that if they admitted to misconduct during the relevant period they feared now that they would lose their license and be unable to earn an income today, making it unlikely that even if they were engaged in companywide misconduct that they would admit to it under oath. *See*, e.g., *Id.* at Ex. 21, pp. 301-302.

### A.     Defendants' "Experts" Garmaise and Schwarz Lack the Foundation Necessary to Offer the Opinions they Express, and Their Opinions Provide No Basis for Decertification

As mentioned above, Defendants' rely almost exclusively on their expert Mark Garmaise for a host of percentage-based arguments about which policies applied to which appraisals and during what time period.  Garmaise opines that "fewer than a quarter of

Case No.:  2:13-cv-08833-CAS(AGRx)

appraisals for both purchase and refinance loans are subject to Pre-Funding appraisal reviews."  Garmaise Report, *see* Def. Appendix, at Ex. A1, p. 26, ¶38.  However, his report and testimony is based on pure speculation, which calls into question his entire analysis of LandSafe's dataset.  Moreover, Defendants' own witnesses contradict his opinions, testifying that reviews were in fact done on *every* appraisal.  Tellis Decl., at Ex. 11, pp. 94-95; *Id.* at Ex. 12, pp. 104-107. In the end, Garmaise was forced to admit when under oath that his opinion that less than a quarter of the appraisals were reviewed had no factual support.  (*Id*. at 89:14-25.)

Defendants' expert, Norbert Schwarz fares no better.  Schwarz opined on the wrong question.  He admitted during deposition that he did not study, and that his opinions are not applicable to review appraisals, management decisions, or functions at Countrywide and LandSafe.  Tellis Decl., at Ex. 5, pp. 25-26.  Of course, this includes the entire appraisal review process.  Since a critical time period for Plaintiffs' case is based on what happened to an appraisal *after* it was delivered to LandSafe, Schwarz's opinions concerning the state of mind of original appraisers are of no import or consequence, and certainly do not support decertification. Tellis Decl., at Ex. 5, pp. 25-26.

### B.    Plaintiffs Have Established Causation

Defendants argue that the claimed violation here is the appraiser's certifications of USPAP compliance.  Def. Mtn. at p. 22.  But that is not true.  The violation here is that Defendants engineered an appraisal scheme, which was guaranteed not to produce USPAP compliant appraisals.  The "injury," of course, is an appraisal fee that was charged to every borrower, thus evidencing that every class member was both impacted and injured.  Tellis Decl., at Ex. 33, pp. 380-381.

Defendants also argue that a borrower would be willing to pay an appraisal fee for a non-USPAP compliant appraisal provided it resulted in a loan.  But as Plaintiffs showed through Garmaise's testimony, Countrywide could not have closed any loans based on a non-USPAP-compliant appraisal had Defendants not ignored their own policies and investor requirements. Garmaise testified:

> A. Okay. Well, in such a case, if a borrower receives one of these assumed non-USPAP-compliant appraisals and it's got a higher appraised value, then that borrower might have received a loan that the borrower would not have received with a lower appraised value.
> Q. Even if it was non-USPAP-compliant?
> A. Well, yes, sir, on your assumption Countrywide was ignoring that requirement.
> Q. And if they didn't ignore that requirement, then the loan never would have been made; right?
> A. Well, if they didn't ignore that requirement and all their appraisals were non-USPAP-compliant, they wouldn't have made any loans.

Tellis Decl., at Ex. 10, pp. 89-90.  *In short, these loans closed because of Defendants' lie that the appraisals were USPAP compliant*.

Defendants also cite to the testimony of named Plaintiffs and absent class members for the proposition that these borrowers wanted their loan to close and therefore they were not injured by Defendants violation of RICO.  But again Defendants are wrong. First, what borrowers cared about or wanted is irrelevant because they had no say in a process that was completely controlled by Defendants. Defendants controlled whether the appraisals were USPAP compliant, and whether the loans closed with non-USPAP compliant appraisals, regardless of what borrowers cared about or wanted.  The injury stems from paying for a product that did not meet the standards represented *and required*.

Second, Defendants misrepresent the import of the testimony of the named Plaintiffs and absent class members, all of whom were taken grossly out of context.  Ms. Williams testified that "I feel as though that when an entity does something wrong, that sometimes people need to take a stand and -- against it so that they don't do it again or harm others. So that's my position. Q: And what is your position with regard to what was done wrong to you? A: That the lender worked with the appraiser to come up with a fraudulent appraisal."  Tellis Decl., at Ex. 28, p. 349.

Absentee class member Zaragoza testified he did not remember applying for or getting a loan with Countrywide 11 years ago.  *Id.* at Ex. 32, pp. 370-372.  Nor did he remember an appraisal being performed in connection with any loan that long ago.  *Id.* at

Case No.:  2:13-cv-08833-CAS(AGRx)

p. 373.  However, Zaragoza was very clear that what mattered to him was what was "right."  *Id.* at p. 374.

Shockingly, Defendants completely misrepresent the import of absent class member Patrick McSkimmings' testimony saying that he "threatened to sue the appraiser ***because the appraisal came in too low for him to get the loan,*** and that he would not have complained if the appraisal had been high enough to get him the loan.  Def. Mtn. at p. 23:4-7 (emphasis added).  But McSkimmings provided no such testimony.  Indeed, McSkimmings clearly testified that he threatened to sue the appraiser ***because he believed the appraiser failed to provide a competent appraisal***, not because of an issue with value. Tellis Decl., at Ex. 64, pp. 689-690.

## C.   Plaintiffs' Allegations of Defendants' Appraisal Scheme States a RICO Claim

Defendants cite to a series of cases arguing it is inappropriate for Plaintiffs to rely on various policies and procedure, some of which do not impact every appraisal. However, Defendants reading of the law is inapplicable to this case.  For example, Defendants cite to *Cholakyan v. Mercedes-Benz, USA, LLC,* 281 F.R.D. 534, 556 (C.D. Cal. 2012) for the proposition that various defects that may exist in car cannot support a class claim against the manufacture where the various defects might only impact subsets of the class vehicles.  *Id.* at 555.  Here however all the appraisals were represented as USPAP compliant.  If the appraisal policies at issue here under which appraisals were performed failed to comply with USPAP, then all appraisals ordered and performed under those same appraisal polices were non-USPAP compliant. And, as Plaintiffs have established here, the non-USPAP compliant appraisal policies at issue here were applicable to each and every Plaintiff and class member.

Defendants next cite *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 227 F.R.D. 586 (S.D. Cal. 2011) arguing that this case is similar.  In that Countrywide case, plaintiffs alleged that Countrywide improperly steered borrowers into toxic loans.  Plaintiffs there alleged that various scripts evidenced the manner in which

Defendants undertook to improperly steer borrowers.  That court held that each loan sale was individualized in that there may have been an initial dialog, but follow up conversations were individualized and handled differently for each borrower.  However, here there is evidence that all lending divisions utilized companywide policies that tainted the appraisal process from the start.  Similarly, Cook opines that all appraisals were non-USPAP complaint due to Defendants' conduct.  Tellis Decl., at Ex. 19, p. 275 ("There is strong evidence that Countrywide's undue influence and control in the appraisal process was exerted on a systemic, nationwide basis during the class period.  Appraisals are not properly judged for reliability based on value.  The reliability of appraisals is based on adherence to fundamental appraisal principles and established appraisal practice which the Defendants violated.")

Finally, the other cases cited by Defendants are not factually similar. *See Kempf v. Barrett Bus. Servs., Inc.,* 336 F.App'x 658 (9th Cir. 2009); *In re Autozone , Inc.*, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016); *Cummings v. Starbucks Corp.* 2014 WL 1379119 (C.D. Cal. Mar. 24, 2014); *Campusano v. BAC Home Loans Serv., LP*, 2013 WL 2302676 (C.D. Cal. Apr. 29, 2013).  Here, because the appraisals are non-USPAP complaint due to the appraisal process itself being corrupted by Defendants practices, Plaintiffs have evidence of their common, classwide RICO claims.

### D. Common Evidence Establishes the Damages Suffered by Class Members

Finally, Defendants argue that the Court must look at what Plaintiffs gave up versus what they received in order to determine whether they suffered damage.  Of course, Plaintiffs were required to pay a substantial fee for their non-compliant appraisals.  But Defendants were obligated by their own internal policies, investor requirements, as well as federal law to deliver an appraisal that was USPAP-compliant.

Plaintiffs' claims and injuries are typical of the claims of and injuries suffered by the class as a whole.  Plaintiffs and members of the class alike were charged, and paid for, an "appraisal" performed pursuant to Defendants' sham appraisal scheme.  The question of whether Defendants' appraisal scheme gives rise to Plaintiffs' claims is purely a

question of law, which is common to all class members, and Plaintiffs' conduct is irrelevant. "[T]ypicality is a 'permissive' standard and 'the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff.'" *In re First American Corp. ERISA Litigation*, 258 F.R.D. 610, 618 (C.D. Cal. 2009) (quoting *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005).

Plaintiffs were promised and charged money for a USPAP compliant appraisal that they did not receive. Plaintiffs did not receive one because Defendants corrupted the appraisal process in order to facilitate the speedy closure of loans that they then offloaded to investors in securitized pools. The Court has already rejected Defendants' assertions, noting that "in light of plaintiffs' allegations that they were required to pay for illegitimate and pre-textual appraisals that systematically violated USPAP, the Court finds that a full refund could be found to be an appropriate remedy and therefore plaintiffs' damages model is consistent with their theory of liability." Dkt. 248, p. 38.

It is immaterial whether Plaintiffs received a loan or not. That loan does not constitute value because it was the lie, not the appraisal that allowed the loan to close. Class members were charged for a product that they did not receive. That is the beginning and end of the inquiry.

## VI.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Class Decertification should be denied.


Dated:  October 14, 2019          BARON & BUDD, P.C.

                                  By: /s/ Roland Tellis
                                      Roland Tellis

                                      Daniel Alberstone
                                      Roland Tellis
                                      Mark Pifko
                                      Evan Zucker
                                      Elizabeth Smiley
                                      BARON & BUDD, P.C.

25

15910 Ventura Boulevard, Suite 1600
Encino, California  91436
Telephone:  (818) 839-2333

Christopher R. Pitoun
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 920
Pasadena, California 91101
Telephone:  (213) 330-7150
Facsimile:   (213) 330-7152

Steve W. Berman
Thomas E. Loeser
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594

Attorneys for Plaintiffs
BARBARA WALDRUP, ELIZABETH
WILLIAMS, BECKIE REASTER,
REBECCA MURPHY individually, and on
behalf of the certified classes

Case No.:  2:13-cv-08833-CAS(AGRx)